DAVID L. NEALE (SBN 141225)
J.P. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  DLN@LNBYB.COM, JPF@LNBYB.COM

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SANTA BARBARA DIVISION

| | |
|---|---|
| In re:<br><br>CRUNCHIES FOOD COMPANY, LLC,<br><br>        Debtor and Debtor in Possession. | ) Case No.: 9:14-bk-11776-PC<br>)<br>) Chapter 11 Case<br>)<br>) **EMERGENCY MOTION FOR**<br>) **INTERIM ORDER (A) AUTHORIZING**<br>) **POSTPETITION FINANCING**<br>) **PURSUANT TO SECTION 364 OF**<br>) **THE BANKRUPTCY CODE, (B)**<br>) **GRANTING LIENS, INCLUDING**<br>) **PRIMING LIENS AND**<br>) **SUPERPRIORITY CLAIMS TO**<br>) **POSTPETITION LENDER**<br>) **PURSUANT TO SECTION 364 OF**<br>) **THE BANKRUPTCY CODE, AND (C)**<br>) **PROVIDING ADEQUATE**<br>) **PROTECTION TO PREPETITION**<br>) **LENDERS; MEMORANDUM OF**<br>) **POINTS AND AUTHORITIES;**<br>) **DECLARATIONS OF JAMES LACEY,**<br>) **RICHARD G. BOYER, AND WILLIAM**<br>) **R. VOSS IN SUPPORT THEREOF**<br>)<br>) <u>Emergency Hearing:</u><br>) Date:  To be set by Court<br>) Time:  To be set by Court<br>) Place: Courtroom  201<br>)      1415 State Street<br>)      Santa Barbara, CA 93101-2511<br>)<br>) |

1

# TABLE OF CONTENTS

2   **SUMMARY** ........................................................................................................................ **2**

3   **ADDITIONAL INFORMATION** ...................................................................................... **4**

4   **MEMORANDUM OF POINTS AND AUTHORITIES** ................................................. **9**

5   **I. STATEMENT OF FACTS** ............................................................................................ **9**

6         A.  The Chapter 11 Filing ............................................................................................ 9

7         B.  Background and Description of the Debtor's Business ........................................... 9

8         C.  Secured Debt Structure and Value of Assets ......................................................... 11

9         D.  The Postpetition Financing .................................................................................... 13

10        E.  The Strategic Benefit of Borrowing from the Postpetition Lender  ..................... 14

11        F.  Summary of Terms ................................................................................................. 16

12  **II. DISCUSSION** ................................................................................................................ **19**

13        A.  The Standard for Obtaining Secured Credit Pursuant to 11 U.S.C. § 364 ............ 20

14        B.  The Procedural Requirements Regarding Approval of this Motion
          Have Been Satisfied. ............................................................................................. 26
15

16  **III.  CONCLUSION** ........................................................................................................... **27**

17  **DECLARATION OF JAMES LACEY** .............................................................................. **29**

18  **DECLARATION OF RICHARD G. BOYER** .................................................................... **39**

19  **DECLARATION OF WILLIAM R. VOSS** ........................................................................ **40**

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

In re 495 Cent. Park Ave. Corp.,
    136 B.R. 626 (Bankr. S.D.N.Y. 1992)........................................................................ 24

In re Ames Dept. Stores, Inc.,
    115 B.R. 34 (Bankr.S.D.N.Y.1990)................................................................ 21, 22, 26

In re Aqua Assoc.,
    123 B.R. 192 (Bankr.E.D.Pa.1991) ...................................................................... 22, 24

In re Beker Ind. Corp.,
    58 B.R. 725 (Bankr. S.D.N.Y. 1986)........................................................................ 24

In re C.B.G. Ltd.,
    150 B.R. 570 (Bankr.M.D.Pa.1992) .......................................................................... 22

In re Crouse Group, Inc.,
    71 B.R. 544 (Bankr.E.D.Pa.1987) ............................................................................ 22

In re Defender Drug Stores,
    126 B.R. 76 (Bankr. D. Ariz. 1991), aff'd 145 B.R. .................................................. 21

In re Ellingsen MacLean Oil Co.,
    834 F.2d 599 (6th Cir. 1987) .................................................................................... 21

In re Hawaiian Pacific Industries,
    17 B.R. 670 (Bankr.D. Hawaii 1982) ........................................................................ 24

In re Hubbard Power & Light,
    202 B.R. 680 (Bankr. E.D.N.Y. 1996) ...................................................................... 24

In re Mellor,
    734 F.2d 1396 (9th Cir.1984) .................................................................................... 24

In re Photo Promotion Associates, Inc.,
    87 B.R. 835 (Bankr.S.D.N.Y.1988), aff'd, 881 F.2d 6 (2d.Cir.1989)........................ 21

In re Planned System, Inc.,
    78 B.R. 852 (Bankr. S.D. Ohio 1987) ...................................................................... 23

Resolution Trust Corp. v. Official Unsecured Creditors Com. (In re
Defender Drug Stores, Inc.),
   145 B.R 312 (9th Cir.B.A.P.1992) .............................................................. 21

Richmond Leasing Co. v. Capital Bank N.A.,
   762 F.2d 1303 (5th Cir.1985) .................................................................. 26

In re Rogers Development Corp.,
   2 B.R. 679 (Bankr.E.D.Va.1980).............................................................. 24

In re Snowshoe Co.,
   789 F.2d 1085 (4th Cir.1986) .................................................................. 22

In re Southern Soya, Corp.,
   251 B.R. 302 (Bankr.D.S.C.2000)............................................................ 21

In re Stein,
   19 B.R. 458 (Bankr.E.D.Pa.1982) ........................................................... 25

In re T.M. Sweeney & Sons LTL Services, Inc.,
   131 B.R. 984 (Bankr.N.D.Ill.1991) .......................................................... 21

In re Triplett,
   87 B.R. 25 (Bankr.W.D.Tex.1988)............................................................ 25

**Other State Cases**

Chaucer Foods Ltd. v. Crunchies Food Company, LLC,
   Case No. 56-2013-00443644-CU-BC-VTA............................................... 3, 10, 30, 31

**Federal Statutes**

11 U.S.C.
   § 361 ...................................................................................................... 23
   §§ 361(1), (2), (3) .................................................................................... 23
   § 363(c)(2)(B)..................................................................................... 6, 18, 36
   § 364(b) i.e............................................................................................. 22
   § 364(c)(1) ......................................................................................... 4, 14, 34
   § 364(d)......................................................................................... 4, 14, 21, 34
   § 503(b)(1)(A)......................................................................................... 22
   §§ 506(c), 544, 545, 547, 548 and 549 ............................................... 6, 18, 36

28 U.S.C.
   §§ 157 and 1334.......................................................................................... 9
   § 157(b)(2) ............................................................................................... 9
   §§ 1408 and 1409....................................................................................... 9

**SUMMARY**

Pursuant to sections 105, 361, and 364 of title 11 of the United States Code, sections 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2081-1(a)(9), 4001-2, and 9075-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "Local Rules"), Crunchies Food Company, LLC (the "Debtor"), the debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case, hereby moves on an emergency basis by way of this *Emergency Motion for an Interim Order (A) Authorizing Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Granting Liens, Including Priming Liens and Superpriority Claims to Postpetition Lender Pursuant to Section 364 of the Bankruptcy Code, and (C) Providing Adequate Protection to Prepetition Lenders* (the "Motion"), for entry of an order authorizing the Debtor to borrow up to $600,000 on the terms set forth herein. In support of this Motion, the Debtor relies on the Motion, the Memorandum of Points and Authorities in support of the Motion, the declration of James Lacey (the "Lacey Declaration"), the separately filed notice of Motion, the statements, arguments, and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

It is critical that this Motion be heard on or before September 12, 2014. The disruption in the Debtor's flow of funds by virtue of operational challenges experienced as a result of the commencement of this bankruptcy case have made it impossible for the Debtor to obtain the necessary raw materials to complete orders for its largest customers. Delivery dates have been extended to the week of September 15, 2014, but the Debtor is advised that its inability to satisfy its orders in a timely fashion will result in the cancellation of such orders. The cancellation of the Debtor's existing orders will devastate the business and will greatly hinder the Debtor's reorganization efforts. In order to fulfill its existing orders, the Debtor must order and pay for product by Friday, September 12, 2014. As such, the timing of the hearing on this Motion is of vital importance.

1    The Debtor filed for chapter 11 bankruptcy protection on August 15, 2014 (the "Petition

2 Date"). The Debtor continues to operate its business, manage its financial affairs, and manage

3 its bankruptcy estate as a debtor in possession pursuant to sections 1107 and 1108 of the

4 Bankruptcy Code.

5    The Debtor is a packaged healthy snack food company founded in Ventura County in

6 2006 by James Lacey with its operations located in Westlake Village, California. Prepetition,

7 the Debtor relied on representations from one of its major trade creditors, Chaucer Foods Ltd, a

8 United Kingdom limited company ("Chaucer"), that financing and capital infusions would be

9 provided, but, after extensive cooperation in due diligence, Chaucer refused to fund the

10 financing and capital and instead presented the Debtor with a takeover offer that was wholly

11 unacceptable. With the promised financing and capital pulled out from under it, the Debtor had

12 no choice but to file for chapter 11 reorganization to protect its estate and all stakeholders.

13 Since the Petition Date, the Debtor has been in serious need of financing to purchase supplies,

14 fill orders, pay warehouses, meet payroll, and continue to operate its business as a going

15 concern. Every cash collateral budget that the Debtor has presented to the Court contemplates

16 and relies on financing in the near term. Without the financing, the Debtor will almost certainly

17 have to shut down its operations, and its going-concern value will be eviscerated in a

18 liquidation.

19    The Debtor seeks approval of financing offered to it by NC Foods, LLC, or an affiliate

20 thereof (the "Postpetition Lender"). In the first three weeks of the case, the Debtor has

21 investigated financing from several sources and has not been able to acquire financing on terms

22 more favorable than those offered by the Postpetition Lender, which terms have been negotiated

23 at arms' length. It is the Debtor's reasonable business judgment that the proposed financing is

24 in the best interest of the estate and necessary to avoid immediate and irreparable harm.

25    The loan (the "Postpetition Debt") is in the amount of up to $600,000, at 6% interest per

26 annum on the amount outstanding, compounded annually, with a default interest rate of 12%.

27 The Postpetition Debt will be *pari passu* with the Chung Loan (as defined herein) and secured

28 by a lien on postpetition collateral that is otherwise senior to the liens in existence on the

3

1  Petition Date pursuant to 11 U.S.C. § 364(d) as well as administrative priority pursuant to 11
2  U.S.C. § 364(c)(1), and the Postpetition Lender's liens and administrative priority claim will
3  remain in full force and effect notwithstanding any subsequent conversion or dismissal of the
4  case.[1]

5        The full terms of the postpetition financing is set forth in the proposed order. A true and
6  correct copy of the proposed form of order granting the Motion is attached as Exhibit "1" to the
7  Lacey Declaration. Creditors and parties in interest wishing to know the exact terms of the
8  financing should read Exhibit "1" hereto. To the extent that there are any inconsistencies or
9  uncertainties between the terms in the proposed order and this Motion, the terms in the proposed
10 order control.

11                        **ADDITIONAL INFORMATION**

12       Bankruptcy Rule 4001(c)(2) requires at least 14 days' notice of a motion for authority to
13 obtain post-petition financing. However, Rule 4001(c)(2) allows the Court to approve post-
14 petition financing on less than 14 days' notice on an interim basis pending a final hearing to the
15 extent necessary to avoid immediate and irreparable harm. The Debtor is requesting a hearing
16 on an emergency basis for interim approval of the financing because, as discussed in the
17 memorandum of points and authorities, there will be immediate and irreparable harm without
18 financing. Due to the lack of financing, the Debtor has delayed the purchase of raw materials
19 and the filling and shipment of orders as long as it can, and any further delay will result in the
20 loss of the Debtor's largest and most important customer accounts, which will destroy the
21 Debtor's going concern value.

22       **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 4001-2
23 (b) and (d), the Debtor submits that the requested relief pertaining to the Debtor's obtaining
24 financing does not (or does) contain any of the following provisions:

25

26

27       [1] The warehouse lien and prepetition claim of CH Robinson Worldwide, Inc, in the
   approximate amount of $105,000 to $150,000 is excluded from this treatment, and CH Robinson
28 Worldwide, Inc. retains its senior secured possessory lien on the collateral in its possession in its
   warehouses.

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | Yes |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | Yes |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor are authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No [but includes general release for post-petition claims and causes of action] |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the Debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | Yes [but *pari passu* with Chung Loan]; both existing secured lenders consent to the lien to be granted to Postpetition Lender |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | Yes |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | Yes |

| **Provision** | |
|---|---|
| | |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

Pursuant to Bankruptcy Rule 4001(c)(1)(B), the Debtor hereby provides the following disclosures with respect to the financing:

| Provision | |
|---|---|
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | Yes, with consent of existing lenders. |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | No. |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | No. |
| A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | Yes. |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | Yes. |
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | No. |

| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | Yes. |
|---|---|
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | Yes. |
| The indemnity of an entity | No. |
| A release, waiver, or limitation of any right under Section 506(c) | No. |
| The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | Yes, as to proceeds of such claims and/or causes of action. |

Pursuant to Bankruptcy Rule 4001(c)(1)(C), the Debtor is required to serve a copy of the Motion on the 20 largest unsecured creditors and any other entity that the Court directs. The Debtor has complied with the foregoing by serving a copy of the Motion by email, facsimile, and/or overnight mail on the 20 largest unsecured creditors. Additionally, the Debtor has served the Motion on the secured creditors and their counsel (if known), the United States Trustee, and parties requesting special notice.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

1. Finding that notice was good and proper;

2. Setting a hearing on the Motion on or before September 12, 2014;

3. Granting this Motion on an interim basis;

4. Approving and authorizing the Debtor to enter into the postpetition financing as set forth in the proposed order attached as Exhibit "1" to the Motion;

5. Granting first priority secured interest in the post-petition collateral to the Postpetition Lender subject only to the pari passu treatment with the Chung Loan;

6. Setting a final hearing on the Motion; and

/ / /

7

1      7.     Granting such other and further relief as the Court deems just and proper.

2  Dated: September 9, 2014          CRUNCHIES FOOD COMPANY, LLC

3

4                       By:   */s/ David L. Neale*
                              David L. Neale

5                             John-Patrick M. Fritz
                             LEVENE, NEALE, BENDER,

6                             YOO & BRILL L.L.P.
                             Proposed Attorneys for Chapter 11

7                             Debtor and Debtor in Possession

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

A.     The Chapter 11 Filing

1.     The Debtor commenced its bankruptcy case by filing a voluntary petition under chapter 11 of title 11, sections 101 *et seq.* of the United States Code (the "Bankruptcy Code") on August 15, 2014 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs, and operate its bankruptcy estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee has been appointed, and no committee of unsecured creditors has been formed.

2.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

B.     Background and Description of the Debtor's Business

3.     The Debtor is a packaged healthy snack food company co-founded in Ventura County in 2006 by James Lacey with its operations located in Westlake Village, California. The Debtor was established in response to the rapid and overwhelming demand for good tasting and truly healthy natural snacks on the market, and it has enjoyed incredible growth year over year. The Debtor developed a line of delicious, fun, pure foods without preservatives, added sugars, trans fats, or excessive sodium. Available in a wide variety of delicious flavors, Crunchies are produced with the Debtor's proprietary freeze-drying process by placing individually frozen fruits and vegetables in a refrigerated vacuum chamber that intensifies flavor and removes up to 97% of moisture, assuring a uniquely crunchy snack that retains almost all of its nutrients and enzymes. Some of the Debtor's products include Freeze Dried Cinnamon Apple, Freeze Dried Mixed Fruit, Freeze Dried Buttered Sweet Corn, Freeze Dried BBQ Roasted Veggies, Freeze Dried Strawberries, Freeze Dried Grapes, Freeze Dried Salted Edamame, and Strawberry Munch Paks.

4.     The Debtor and its products have received favorable coverage in some 40

national magazines and hundreds of regional newspapers, and the Debtor is poised to continue its growth. Crunchies snacks is the number one freeze dried fruit and vegetable bag snack in the market place and fastest growing brand in both the freeze dried and dried fruit categories. The Debtor almost tripled sales in 2012 and distributes its products through 26,000 stores. In 2013, the Debtor's business was valued at approximately $15 million as a going concern for purposes of raising new capital

5.     To support its growth, the Debtor raised capital contributions from 53 shareholders and reinvested profits generated by the Debtor back into the company. However, the rapid growth of the Debtor's business required more funding than was available from investors and internal operations. As a result, the Debtor had to turn to third party financing to support its expanding operations.

6.     The Debtor receives the raw materials for its products from various vendors, including Chaucer Foods Ltd, a United Kingdom limited company ("Chaucer"), which supplied it with freeze dried strawberries. On October 18, 2013, Chaucer filed a lawsuit against the Debtor in Ventura County Superior Court entitled, *Chaucer Foods Ltd. v. Crunchies Food Company, LLC*, Case No. 56-2013-00443644-CU-BC-VTA (the "Chaucer Lawsuit"), claiming the Debtor owed it at least $1,537,828 for unpaid invoices. The Debtor and Chaucer reached a settlement agreement, but the lawsuit greatly damaged the Debtor's business during October, November, and December of 2013.

7.     The settlement agreement set forth a payment schedule requiring the Debtor to make installment payments such that the total debt would be paid in full by July 31, 2014. Over a three-month period, the Debtor paid approximately one-third of the debt to Chaucer, totaling approximately $500,000. However, the Debtor was unable to make all of the payments under the extremely aggressive payment schedule in the agreement. During March, April, and May 2014, Chaucer offered to convert its debt into equity and promised that it would invest $1 million in the company but failed to deliver, which resulted in harm to both the Debtor and its creditors. Chaucer later used the Debtor's financial obligations as the basis for aggressive actions designed to acquire control of the Debtor.

8.     The Debtor has learned that Chaucer had plans to move into the United States market and appeared interested in taking over the Debtor as a launching platform for its domestic operations. Under the guise of intending to invest $1 million in the Debtor, Chaucer brought in a team from KPMG, U.K. to perform due diligence on the Debtor on June 2, 2014. Chaucer completed its due diligence in late June 2014 and had promised to invest another $400,000 in equity. For months, the Debtor expected an investment and equity contribution. Then, in August 2014, Chaucer revealed its true intention for a hostile takeover of the Debtor through an out-of-court assignment for the benefit of creditors, through which Chaucer would take 23.33% of the recapitalized company, with other significant ownership stakes for the Debtor's two largest secured creditors and a small ownership stake for James Lacey, while eliminating the existing equity ownership of the Debtor and returning nothing for unsecured creditors.

9.     The Debtor also receives supplies from another supplier, Shandong Searsport Foods, Co., Ltd. ("Searsport"). Separate and apart from the Chaucer litigation, on August 20, 2013, Searsport sued the Debtor for a debt of at least $845,661.48, in a lawsuit entitled *Shandong Searsport Foods v. Crunchies Food*, bearing case number 56-2013-00440790-CU-CL-VTA. The parties entered a stipulated settlement with payment plan. The Debtor made payments on over half of the amount owed under the settlement and payment plan but was unable to raise funds and defaulted because of the fallout with Chaucer.

10.     In order to preserve the Debtor's estate, the value as a going concern, and recovery for all creditors and stakeholders, the Debtor determined in its reasonable business judgment that filing for chapter 11 bankruptcy was in the best interest of the estate and its creditors.

C.     Secured Debt Structure and Value of Assets

11.     In December 2013, the Debtor received a loan for $1.5 million from Seung Chung, as Trustee of the Chung Family Trust ("Chung"), and then an additional $500,000 in February 2014, which loan is allegedly secured by all of the Debtor's assets (the "Chung Loan"). A UCC-1 financing statement for the Chung Loan was filed with the California

11

1  Secretary of State on December 20, 2013. The purpose of the loan was to grow and expand the
2  Debtor's business.

3        12.    The Debtor received two loans in the amounts of $300,000 and $500,000 in 2010
4  and a third loan in the amount of $4.2 million in October 2011 for a total loan amount of $5
5  million from the Donald Delaski Revocable Trust, Dated December 14, 2000 ("Delaski"), which
6  loan is allegedly secured by all of the Debtor's assets (the "Delaski Loan"). The loan was
7  originally unsecured but was renegotiated for a lower interest rate and made secured in January
8  2014. A UCC-1 financing statement for the Delaski Loan was filed with the California
9  Secretary of State on March 11, 2014. The purpose of the loan was also to grow and expand the
10  Debtor's business. Delaski is also a member of the Debtor with a $2 million equity investment.
11  The Chung Loan has priority over the Delaski Loan.

12        13.    Wells Fargo Bank has a lien and claim in the amount of approximately $12,000
13  secured by one forklift owned by the Debtor, which the Debtor values at $5,000, based on prices
14  of used forklifts on the market. The Debtor proposes to continue to make regular monthly loan
15  payment of $289 per month as adequate protection.

16        14.    Prior to the Petition Date, the Debtor entered into one or more warehouse
17  agreements (the "Agreements") with CH Robinson ("CHR"), pursuant to which CHR agreed to
18  store goods delivered by the Debtor ("Stored Goods") and provide certain warehouse services.

19        15.    The Agreement provides, among other things, that CHR shall have a general
20  warehouse lien for all lawful charges for storage and preservation of the Stored Goods and for
21  all unpaid obligations of the Debtor. CHR contends that its possessory lien on the Stored Goods
22  has priority over any other security interests asserted by any creditor against the Stored Goods.
23  As of the Petition Date, CHR contends that its claim (the "CHR Claim"), in the total amount due
24  and payable by the Debtor under the Agreements, was approximately $150,000, while the
25  Debtor contends it was approximately $105,000. As of the Petition Date, the Debtor contends
26  that the Stored Goods had a market value of approximately $500,000, substantially in excess of
27  the CHR Claim

28        16.    In May 2014, the Debtor's business as a going concern was valued at

approximately $14,880,000 by using a discounted cash flow approach methodology. The valuation calculated the present value of the proposed cash flows to investors along with the present value of the balance sheet equity in year 2019 based on James Lacey's forecast of sales and related expenses for the years 2014 through 2019, then applied a 19.5% discount factor. Attached as Exhibit "2" to the annexed declaration of Richard G. Boyer, CPA is a true and correct copy of valuation. The value of the Debtor's trademark, brand, and intellectual property is unknown.

17.     On September 8, 2014, the Debtor and CHR entered into a stipulation for treatment of CHR's warehouse lien and turnover of property of the estate to the Debtor. The stipulation is the subject of a separate motion filed by the Debtor on September 8, 2014. The stipulation provides CHR with adequate protection, a senior lien, and payments for the Stored Goods at its warehouses.

D.     The Postpetition Financing

18.     Prepetition, the Debtor relied on representations from Chaucer that financing and capital infusions would be provided, but, after extensive cooperation in due diligence, Chaucer refused to fund the financing and capital and instead presented the Debtor with a takeover offer that was wholly unacceptable. With the promised financing and capital pulled out from under it, the Debtor had no choice but to file for chapter 11 reorganization to protect its estate and all stakeholders. Since the Petition Date, the Debtor has been in serious need of financing to purchase supplies, fill orders, pay warehouses, meet payroll, and continue to operate its business as a going concern. Every cash collateral budget that the Debtor has presented to the Court contemplates and relies on financing in the near term. Without the financing, the Debtor will almost certainly have to shut down its operations, and its going-concern value will be eviscerated in a liquidation.

19.     The Debtor has canvassed other potential financing options. At the present time, all or substantially all of the Debtor's assets are encumbered by the security interests. Based on the Debtor's search and review of the current market, it is clear that, as is typical in a Chapter 11 case, no lender is willing to provide the Debtor with the needed funding without a senior

1  secured priming lien or, in the absence of such priming lien, repayment terms and restrictions on

2  the Debtor's reorganization options that are so outrageous as to be decidedly beyond what the

3  Debtor could agree to in exercising its fiduciary responsibilities to the estate.

4      20.     The Debtor seeks approval of financing offered to it by NH Foods, LLC, or an

5  affiliate thereof (the "Postpetition Lender"). In the first three weeks of the case, the Debtor has

6  investigated financing from several sources and has not been able to acquire financing on terms

7  more favorable than those offered by the Postpetition Lender, which terms have been negotiated

8  at arms' length. It is the Debtor's reasonable business judgment that the proposed financing is

9  in the best interest of the estate and necessary to avoid immediate and irreparable harm.

10     21.     The loan (the "Postpetition Debt") is in the amount of up to $600,000, at 6%

11 interest per annum, compounded annually, with a default interest rate of 12%. The Postpetition

12 Debt will be secured by a lien on postpetition collateral that is *pari passu* with the Chung Loan

13 and otherwise senior to the liens in existence on the Petition Date pursuant to 11 U.S.C. § 364(d)

14 as well as administrative priority pursuant to 11 U.S.C. § 364(c)(1), and the Postpetition

15 Lender's liens and administrative priority claim will remain in full force and effect

16 notwithstanding any subsequent conversion or dismissal of the case.[2]

17     E.     The Strategic Benefit of Borrowing from the Postpetition Lender

18     22.     Postpetition Lender is an affiliate of Lake Pacific Partners, a leading private

19 equity firm focused exclusively on the food and consumer products industry. A selection of

20 Lake Pacific's relevant portfolio companies have included:

21         a.  ***Teepak***, a leading manufacturer of cellulose and fibrous casings for the

22             processed meat industry with about $200 million in revenue.

23         b.  ***Maxi***, a manufacturer of branded processed, frozen chicken products

24             marketed under the Yummy brand. Its Dino Buddies are the top selling

25             children's chicken nugget in the US.

---

27 [2] The warehouse lien and prepetition claim of CHR in the approximate amount of

28 $105,000 to $150,000 is excluded from this treatment, and CHR retains its senior secured

possessory lien on the collateral in its possession in its warehouses.

c. ***Cal-Pacific Specialty Foods***, in San Jose, CA, is one the largest industrial processor of strawberries in North America.

d. ***Mercer Foods***, based in Modesto, CA, is a recognized leader in freeze drying a range of fruits and vegetables. It markets products to retailers, restaurant chains and industrial customers, and has a broad range of capabilities that include dehydration, client product development, sourcing, dicing, milling and screening and retail-ready packaging capabilities for finished products.

23. Cal-Pacific Specialty and Mercer Food, in particular, are potential strategic resources for the Debtor. As explained above, one of the Debtor's prior suppliers is fairly adversarial to Debtor today. This has contributed to a supply-sourcing problem for Debtor.

24. Mercer, in particular, not only sells raw ingredients that Debtor requires but it actually has the means to package Debtor's products on a contract basis. While not an element of the proposed financing, the prospect that Debtor may be able to do business with Mercer is particularly attractive, especially due to Debtor's urgent need to replenish inventories in order to meet near term demand.

25. To be clear, Debtor is not required to buy from Mercer (or any of its affiliates) nor are they required to sell to Debtor. However, the parties have been discussing doing business in the ordinary course, which could be very beneficial to Debtor.

26. Postpetition Lender's interest in serving as a DIP lender in this case is not driven by the desire to earn significant interest and fees. Indeed, the reasonableness of the terms of the postpetition financing is some indication of this. Rather, Postpetition Lender's primary interest in Debtor is as an acquisition target or investment.

27. Debtor is particularly enthused about the background of the Lake Pacific Management Team, which has deep experience in building profitable businesses in the food industry. For example, William R. Voss was the founder, chairman, and chief executive officer of Natural Nutrition Group (NNG), a company he led in acquiring and developing brands in the natural food industry. Between 1996 and 1999, NNG acquired several companies, including

Health Valley, creating one of the largest natural food manufacturers in the U.S. In May 1999, NNG was sold to the Hain Celestial Group, a public company with interests in the natural food industry. Prior to forming NNG, Mr. Voss was chief executive officer of McCain Foods, a large privately owned frozen food manufacturer. He also served as president, chief operating officer and director of Pilgrim's Pride Corporation, a publicly traded food processor. In addition, he was a principal with Booz, Allen & Hamilton, management consultants, where he advised Fortune 500 clients in the consumer products and retailing industries. He has also served as Chairman of Nash Finch Company, a \$5 billion food wholesaler and retailer.

28.     In stark contrast to its view of Chaucer, the Debtor is excited at the possibilities of teaming with Postpetition Lender's affiliates. To be clear, the postpetition financing doesn't do anything to bind the Debtor in this regard. However, the optionality Postpetition Lender's interest provides is a significantly positive development for the Debtor and its constituents. Indeed, Debtor believes this is part and parcel of why the Debtor's secured lenders have consented to being primed by Postpetition Lender.

F.     Summary of Terms

29.     For the convenience of the Court and in compliance with Local Bankruptcy Rule 4001-2(c), certain essential terms of the postpetition financing are summarized herein. The full terms of the postpetition financing are set forth in the proposed order. A true and correct copy of the proposed form of order granting the Motion and approving the postpetition financing is attached as Exhibit "1" to the Lacey Declaration. Creditors and parties in interest wishing to know the exact terms of the financing should read Exhibit "1" hereto. To the extent that there are any inconsistencies or uncertainties between the terms in the proposed order and this Motion, the terms in the proposed order control.[3]

---

[3] The Debtor, Pospetition Lender, Chung and Delaski are finalizing the terms and conditions of a loan agreement, intercreditor agreement and related documents (the "Postpetition Documents"). These additional documents will be filed with the Court and served upon parties in interest prior to the hearing scheduled on this Motion. Given the exigencies of this situation, the relevant parties have agreed that the Debtor should proceed with this Motion and may represent to the Court that there is general agreement upon all of the material terms and conditions of the proposed financing, and that Chung and Delaski join in the Debtor's request for a hearing on this Motion on an expedited basis.

1    30.    As required by Local Bankruptcy Rule 4001-2(c), the summary of terms are as

2  follows:

3    a.  Interim borrowing limit: up to the maximum of $600,000;

4    b.  Maximum borrowing available on a final basis: $600,000;

5    c.  borrowing conditions: approval of the Motion and other terms set forth in the

6        Postpetition Documents;

7    d.  Events of default: At Postpetition Lender's election, (i) the Debtor's failure to

8        comply with the covenants or perform any of its obligations in accordance with

9        the terms of the Postpetition Documents and order granting the Motion; and (ii)

10       the occurrence and continuance of any "Event of Default" (as that term is defined

11       in the Postpetition Documents);

12    e.  Outside maturity date: February 15, 2015;

13    f.  Use of funds limitations: As set forth in the DIP Budget and in accordance with

14        the order approving the Motion;

15    g.  Protections afforded under §§ 363 and 364: No additional secured financing

16        without Postpetition Lender's consent.  Use of funds solely in accordance with

17        terms of DIP Budget.

18    31.    Pursuant to Local Bankruptcy Rule 4001-2 (b) and (d), the Debtor submits that

19  the requested relief pertaining to the Debtor's obtaining financing does not (or does) contain any

20  of the following provisions:

21

| Provision | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | Yes |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of | Yes |

17

| Provision | |
|---|---|
| any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor are authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No [but includes general release for post-petition claims and causes of action] |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the Debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | Yes [but *pari passu* with Chung Loan]; both Chung and Delaski consent to the proposed lien |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | Yes |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | Yes |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |

| **Provision** | |
| --- | --- |
| | |
| Findings of fact on matters extraneous to the approval process. | No |

32.   Pursuant to Bankruptcy Rule 4001(c)(1)(B), the Debtor hereby provides the following disclosures with respect to the financing:

| Provision | |
| --- | --- |
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | Yes, with consent of existing lenders. |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | No. |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | No. |
| A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | Yes. |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | Yes. |
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | No. |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | Yes. |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | Yes. |
| The indemnity of an entity | No. |
| A release, waiver, or limitation of any right under Section 506(c) | No. |

19

| The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | Yes, as to proceeds of such claims and/or causes of action. |
|---|---|

33.     The Debtor represents that the financing is in the best interest of the estate and that the Court should grant the Motion and approve the financing for an interim period on an emergency basis.

## II.

## DISCUSSION

**A.     The Standard for Obtaining Secured Credit Pursuant to 11 U.S.C. § 364.**

Pursuant to Section 364 of the Bankruptcy Code, the Court may, after notice and a hearing, grant authority to a trustee or debtor in possession to obtain credit or incur a debt secured by a lien on property of the estate.  Section 364(c) of the Bankruptcy Code provides, in pertinent part, as follows:

> If the trustee is unable to obtain unsecured debt allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or "priming" loans, which provides as follows:

> The Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –
>
> (A)     the trustee is unable to obtain such credit otherwise; and

20

1

2     (B) there is adequate protection of the interest of the
holder of the lien on the property of the estate on which such senior
3    or equal lien is proposed to be granted.

4 11 U.S.C. § 364(d).

5    Section 364 of the Bankruptcy Code is structured with an escalating series of

6 inducements which a debtor in possession may offer to obtain credit during the post-petition

7 period. In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr.S.D.N.Y.1988), aff'd,

8 881 F.2d 6 (2d.Cir.1989); In re Southern Soya, Corp., 251 B.R. 302, 307 (Bankr.D.S.C.2000);

9 In re Ames Dept. Stores, Inc., 115 B.R. 34, 37 (Bankr.S.D.N.Y.1990).   Therefore, where a

10 trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such

11 credit may be obtained on a secured basis under stated conditions.   In re T.M. Sweeney & Sons

12 LTL Services, Inc., 131 B.R. 984, 989 (Bankr.N.D.Ill.1991); In re Ames Dept. Stores, Inc., 115

13 B.R. at 37.   For example, if creditors are unwilling to extend unsecured credit to a debtor in

14 possession, further inducements are offered, with court approval, after notice and a hearing,

15 including, without limitation, liens equal to or senior to existing liens on encumbered property in

16 accordance with 11 U.S.C. § 364(d).   In re Photo Promotion Associates, Inc., 87 B.R. at 839; see

17 Resolution Trust Corp. v. Official Unsecured Creditors Com. (In re Defender Drug Stores, Inc.),

18 145 B.R 312, 317 (9th Cir.B.A.P.1992).

19    Section 364(c) of the Bankruptcy Code also enumerates certain incentives that a court

20 may grant to post-petition lenders.   The Section 364(c) list, however, is not exhaustive.   Courts

21 frequently have authorized the use of inducements not specified in the statute.   See, e.g., In re

22 Ellingsen MacLean Oil Co., 834 F.2d 599 (6th Cir. 1987) (affirming financing order which

23 prohibited any challenges to the validity of already existing liens); In re Defender Drug Stores,

24 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), aff'd

25 145 B.R. at 316 ("[b]ankruptcy courts . . . have regularly authorized postpetition financial

26 arrangements containing lender incentives beyond the explicit priorities and liens specified in

27 section 364").

28

1       Two factors courts consider in determining whether to authorize post-petition financing

2  which contemplates the granting of a super-priority administrative claim in favor of the lender

3  are (1) whether the debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b) i.e., by

4  allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); and (2) whether

5  the terms of the transaction are fair, reasonable and adequate, given the circumstances of the

6  debtor-borrower and the proposed lender. See In re Crouse Group, Inc., 71 B.R. 544, 549

7  (Bankr.E.D.Pa.1987); see also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr.E.D.Pa.1991).

8       In addition to the foregoing, a debtor in possession seeking subordination of liens to new

9  financing must establish adequate protection of the liens to be subordinated to the new

10  financing. In re C.B.G. Ltd., 150 B.R. 570, 571 (Bankr.M.D.Pa.1992).

11       In the instant case, the Debtor has satisfied the standards for approval of the Postpetition

12  Debt on the terms provided in the proposed order. The Debtor was unable to find sufficient

13  financing on a purely administrative claim basis, and the terms of the Postpetition Debt are fair,

14  reasonable, and adequate under the circumstances. Furthermore, the existing secured creditors

15  whose liens will be primed, Delaski and Wells Fargo, will be adequately protected by

16  continuation of the Debtor's business as a going concern, which valuation is approximately $15

17  million and provides for a substantial equity cushion. Moreover, Chung and Delaski have

18  agreed to the financing with the Postpetition Lender.

19      1.     The Debtor Was Unable to Obtain Unsecured Credit. In satisfying the standards

20  of Section 364, a debtor need not seek credit from every available source, but should make a

21  reasonable effort to seek other sources of credit available under § 364(a) and (b). See, e.g., In re

22  Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir.1986) (trustee had demonstrated by good faith

23  effort that credit was not available without senior lien by unsuccessfully contacting other

24  financial institutions in immediate geographic area; "the statute imposes no duty to seek credit

25  from every possible lender before concluding that such credit is unavailable"); Ames, supra, 115

26  B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where

27  debtors approached four lending institutions).

28

1    Here, the Debtor's managing member, James Lacey, spent three weeks taking calls,

2  responding to emails, and meeting in person with several parties offering post-petition

3  financing. The Debtor's bankruptcy case generated a lot of interest in investment in the Debtor

4  starting with such financing, and Mr. Lacey responded to virtually all of these offers. Several of

5  the proposals were for inadequate loans or loans subject to onerous terms and conditions. The

6  best financing option proposed was the Postpetition Debt from the Postpetition Lender.

7    2.    The Terms of the Proposed Financing Are Fair, Reasonable and Adequate. The

8  Debtor submits that terms of the proposed post-petition financing from Postpetition Lender are

9  fair, reasonable and adequate. Postpetition Lender is not an insider of the Debtor and has been

10  asked to commit to providing the Debtor with up to $600,000 of post-petition financing. The

11  interest rate of 6% per annum is reasonable, and the Debtor negotiated for this rate at arms'

12  length.   The Postpetition Debt offers the Debtor its best opportunity to keep the Debtor

13  operating and increase the going-concern value of the business. Without the loan, it is highly

14  likely that the Debtor will not be able to buy raw materials, fill orders, and ship to its customers,

15  which have been put on hold for the first three weeks of the case while financing and cash were

16  not available.   The terms of the financing were extensively negotiated by and between the

17  Debtor and Postpetition Lender at arm's length.   The financing terms and amount of credit

18  offered by Postpetition Lender are the best terms offered to the Debtor.

19    3.    The Liens Being Subordinated Are Adequately Protected. The proposed priming

20  liens are authorized by the Bankruptcy Code, even absent consent of other existing lien holders.

21  Bankruptcy Code § 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien

22  holders which assert an interest in collateral.   Section 361 provides a non-exhaustive list of

23  possible forms of adequate protection.   11 U.S.C. § 361.   However, adequate protection is

24  required to be furnished only to the extent a debtor's "use, sale, lease or grant results in a

25  decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3)

26  (emphasis added). Stated succinctly, adequate protection protects a secured creditor against a

27  decrease in the value of its collateral. See e.g., In re Planned System, Inc., 78 B.R. 852, 861-62

28  (Bankr. S.D. Ohio 1987). This standard applies equally with respect to a proposed "priming"

1  financing under section 364(d)(1)(B). See, e.g., In re Hubbard Power & Light, 202 B.R. 680,

2  685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision

3  entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard

4  the secured creditor from diminution in the value of its interests."); In re Aqua Assoc., 123 B.R.

5  192, 196 (Bankr. E.D. Pa. 1991); In re Beker Ind. Corp., 58 B.R. 725, 741-42 (Bankr. S.D.N.Y.

6  1986).

7          The Court has broad discretion to determine whether adequate protection is furnished.

8  See e.g., In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether

9  the party entitled to such protection is over or undersecured is not dispositive of whether

10 adequate protection is furnished. As the court in Aqua Assoc., 123 B.R. 192, noted:

11                  Therefore, we believe that, while the presence of an equity
                    cushion should be a relevant factor, it should not be a
12                  determinative factor in any 'adequate protection' analysis, and
                    particularly one relating to § 364(d)(1)(B).   The important
13                  question, in determination of whether the protection to a creditor's
                    secured interest is adequate, is whether that interest, whatever it is,
14                  is being unjustifiably jeopardized.

15 Id. at 196 (emphasis added; approving priming financing where interest rate was 5% over prime

16 and loan likely would enhance value of estate).

17         It is well established that the existence of an equity cushion alone can constitute

18 adequate protection to a secured creditor.   In re Mellor, 734 F.2d 1396 (9th Cir.1984).   In

19 Mellor, the Ninth Circuit held that a 20% equity cushion constituted adequate protection as a

20 matter of law. Id. at 140-01.  The Ninth Circuit indicated that a cushion of less than 20% could

21 also constitute adequate protection and cited with approval decisions holding that equity

22 cushions of between 10% and 20% constituted adequate protection.  Id., (citing In re McGowan,

23 6 B.R. 241, 243 (Bankr.E.D.Pa.1980) (holding that a 10% cushion is adequate protection); In re

24 Rogers Development Corp., 2 B.R. 679, 685 (Bankr.E.D.Va.1980) (equity cushion of

25 approximately 15% to 20% was adequate protection notwithstanding that the debtors had no

26 equity in the property); see also, In re Hawaiian Pacific Industries, 17 B.R. 670, 673 (Bankr.D.

27 Hawaii 1982) (15% cushion constituted adequate protection).

28

24

1    Here, the Debtor's business has a going-concern value of approximately $15 million. As

2    long as the company continues to operate, the secured creditors are adequately protected by

3    substantial equity cushions.    The Postpetition Loan is *pari passu* with the Chung Loan.

4    Furthermore, Chung has an alleged secured claim of $2 million. Based on a valuation of $15

5    million, Chung is protected by a $13 million, 650%, equity cushion. Delaski has a secured

6    claim of $5 million. Based on a $15 million valuation, and after accounting for Chung's senior

7    lien of $2 million, Delaski is still protected by an $8 million, 160%, equity cushion. These

8    equity cushions are far in excess of the 10% or 20% equity cushions that the Ninth Circuit has

9    found adequate to protected secured creditors.    Accordingly, the secured creditors are

10   adequately protected and the Debtor should be allowed to incur $600,000 of post-petition

11   financing with the proposed priming lien (which is only *pari passu* as to Chung).

12   Additionally, the preservation of the value of a secured creditor's lien is sufficient to

13   provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. In

14   re Triplett, 87 B.R. 25 (Bankr.W.D.Tex.1988).    See also In re Stein, 19 B.R. 458

15   (Bankr.E.D.Pa.1982). In Stein, the Court found that, as a general rule, a debtor may use cash

16   collateral where such use would enhance or preserve the value of the collateral, and allowed the

17   debtor therein to use cash collateral even though the secured party had no equity cushion for

18   protection. The Stein Court determined that the use of cash collateral was necessary to the

19   continued operations of the debtor, and that the creditor's secured position could only be

20   enhanced by the continued operation of the debtor's business. See also In re McCombs, supra,

21   where the court determined that the debtor's use of cash collateral for needed repairs,

22   renovations and operating expenses eliminated the risk of diminution in the creditor's interest in

23   the cash collateral and such use would more likely increase cash collateral.

24   Such adequate protection of any existing liens is present in the Debtor's case because

25   without the proposed financing from Postpetition Lender, the Debtor would be required to

26   permanently shut down and all of Debtor's going-concern value would be immediately and

27   permanently lost.    In contrast, the proposed financing enables the Debtor to pay critical

28   expenses, resume operations, and fill and ship orders to key customers that will create and

25

increase value for all parties, particularly the existing secured creditors whose liens will be primed. The Debtor is advised that the Postpetition Lender has obtained the consent of Chung and Delaski to the material terms of the financing, including, without limitation, the proposed priming lien.

4.    The Proposed Financing Is Necessary and Proper. The Court is authorized to act in its informed discretion in determining whether to approve post-petition financing. In re Ames Dept. Stores, Inc., 115 B.R. at 37. However, the Court should give broad deference to the business decision of a Chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds. Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir.1985). "[T]he court's discretion under section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . ." In re Ames Dept. Stores, Inc., 115 B.R. at 40.

Without additional financing, the Debtor will be required to permanently shut down its business operations because it will be unable to buy raw materials and fill and ship orders to its key customers, which are absolutely necessary for the Debtor to continue operating as a going concern and preserve and increase value for the estate. Without this financing, there will be irreparable harm to the Debtor and all creditors of the estate. The Debtor has therefore concluded that obtaining post-petition financing on the proposed terms herein is in the best interests of the Debtor's estate.

**B.    The Procedural Requirements Regarding Approval of this Motion Have Been Satisfied.**

Bankruptcy Rule 4001(c)(2) requires at least 14 days' notice of a motion for authority to obtain post-petition financing. However, Rule 4001(c)(2) allows the Court to approve post-petition financing on less than 14 days' notice on an interim basis pending a final hearing to the extent necessary to avoid immediate and irreparable harm. The Debtor is requesting a hearing on an emergency basis for interim approval of the financing because there will be immediate

1    and irreparable harm without financing. Due to the lack of financing, the Debtor has delayed

2    the purchase of raw materials and the filling and shipment of orders as long as it can, and any

3    further delay will result in the loss of the Debtor's largest and most important customer

4    accounts, which will destroy the Debtor's going concern value for the estate.

5           Pursuant to Bankruptcy Rule 4001(c)(1)(C), the Debtor is required to serve a copy of the

6    Motion on the 20 largest unsecured creditors and any other entity that the Court directs. The

7    Debtor has complied with the foregoing by serving a copy of the Motion by email, facsimile,

8    and/or overnight mail on the 20 largest unsecured creditors. Additionally, the Debtor has served

9    the Motion on the secured creditors and their counsel (if known), the United States Trustee, and

10    parties requesting special notice.

11    **III.**

12    **CONCLUSION**

13    **WHEREFORE,** the Debtor respectfully requests that the Court enter an order:

14    1.    Finding that notice was good and proper;

15    2.    Setting a hearing on this Motion on or before September 12, 2014;

16    3.    Granting this Motion on an interim basis;

17    4.    Approving and authorizing the Debtor to enter into the postpetition financing as

18         set forth in the proposed order attached as Exhibit "1" to the Motion;

19    5.    Granting first priority secured interest in the post-petition collateral to the

20         Postpetition Lender subject only to the *pari passu* treatment with the Chung

21         Loan;

22    6.    Setting a final hearing on the Motion; and

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

27

1        7.    Granting such other and further relief as the Court deems just and proper.

2    Dated: September 9, 2014        CRUNCHIES FOOD COMPANY, LLC

3

4        By:___*David L. Neale*___
        David L. Neale
        John-Patrick M. Fritz

5            LEVENE, NEALE, BENDER,
        YOO & BRILL L.L.P.

6            Proposed Attorneys for
        Chapter 11 Debtor and

7            Debtor in Possession

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF JAMES LACEY

I, JAMES LACEY, hereby declare as follows:

1.    I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.    I am the co-founder, President, Managing Member, and CEO of Crunchies Food Company, LLC (the "Debtor"). I have reviewed and am familiar with and am knowledgeable about the books and records of the Debtor, which books and records are made in the regular practice of business, kept in the regular course of business, made by a person with knowledge of the events and information related thereto, and made at or near the time of events and information recorded. This declaration is based on my personal knowledge and information and the books and records of the Debtor.

3.    I have over 30 years of experience in the food production and packaging industry.

4.    I make this Declaration in support of the Debtor's *Emergency Motion for an Interim Order (A) Authorizing Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Granting Liens, Including Priming Liens and Superpriority Claims to Postpetition Lender Pursuant to Section 364 of the Bankruptcy Code, and (C) Providing Adequate Protection to Prepetition Lenders* (the "Motion"). Unless otherwise stated with specificity or implied by context, capitalized defined terms have the same meaning in this declaration as used in the Motion.

5.    The Debtor commenced its bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on August 15, 2014 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs, and operate its bankruptcy estate as a debtor in possession. No trustee has been appointed, and no committee of unsecured creditors has been formed.

6.    The Debtor is a packaged healthy snack food company co-founded in Ventura County in 2006 by me, James Lacey, with its operations located in Westlake Village, California. The Debtor was established in response to the rapid and overwhelming demand for good tasting

1 and truly healthy natural snacks on the market, and it has enjoyed incredible growth year over
2 year. The Debtor developed a line of delicious, fun, pure foods without preservatives, added
3 sugars, trans fats, or excessive sodium. Available in a wide variety of delicious flavors,
4 Crunchies are produced with the Debtor's proprietary freeze-drying process by placing
5 individually frozen fruits and vegetables in a refrigerated vacuum chamber that intensifies flavor
6 and removes up to 97% of moisture, assuring a uniquely crunchy snack that retains almost all of
7 its nutrients and enzymes. Some of the Debtor's products include Freeze Dried Cinnamon
8 Apple, Freeze Dried Mixed Fruit, Freeze Dried Buttered Sweet Corn, Freeze Dried BBQ
9 Roasted Veggies, Freeze Dried Strawberries, Freeze Dried Grapes, Freeze Dried Salted
10 Edamame, and Strawberry Munch Paks.

11       7.     I am President, Managing Member, and CEO of the Debtor. I am a seasoned
12 industry executive with over 30 years of experience in consumer packaged goods. I have
13 managed the Debtor through one of the worst economic times since the great depression,
14 achieving recognition as the number one manufacturer in the freeze dried snack segment. The
15 Debtor and its products have received favorable coverage in some 40 national magazines and
16 hundreds of regional newspapers, and the Debtor is poised to continue its growth. Crunchies
17 snacks is the number one freeze dried fruit and vegetable bag snack in the market place and
18 fastest growing brand in both the freeze dried and dried fruit categories. The Debtor almost
19 tripled sales in 2012 and distributes its products through 26,000 stores. In 2013, the Debtor's
20 business was valued at approximately $15 million as a going concern for purposes of raising
21 new capital

22       8.     To support its growth, the Debtor raised capital contributions from 53
23 shareholders and reinvested profits generated by the Debtor back into the company. However,
24 the rapid growth of the Debtor's business required more funding than was available from
25 investors and internal operations. As a result, the Debtor had to turn to third party financing to
26 support its expanding operations.

27       9.     The Debtor receives the raw materials for its products from various vendors,
28 including Chaucer Foods Ltd, a United Kingdom limited company ("Chaucer"), which supplied

1   it with freeze dried strawberries. On October 18, 2013, Chaucer filed a lawsuit against the

2   Debtor in Ventura County Superior Court entitled, *Chaucer Foods Ltd. v. Crunchies Food*

3   *Company, LLC*, Case No. 56-2013-00443644-CU-BC-VTA (the "Chaucer Lawsuit"), claiming

4   the Debtor owed it at least $1,537,828 for unpaid invoices. The Debtor and Chaucer reached a

5   settlement agreement, but the lawsuit greatly damaged the Debtor's business during October,

6   November, and December of 2013.

7        10.    The settlement agreement set forth a payment schedule requiring the Debtor to

8   make installment payments such that the total debt would be paid in full by July 31, 2014. Over

9   a three-month period, the Debtor paid approximately one-third of the debt to Chaucer, totaling

10   approximately $500,000. However, the Debtor was unable to make all of the payments under

11   the extremely aggressive payment schedule in the agreement. During March, April, and May

12   2014, Chaucer offered to convert its debt into equity and promised that it would invest $1

13   million in the company but failed to deliver, which resulted in harm to both the Debtor and its

14   creditors. Chaucer later used the Debtor's financial obligations as the basis for aggressive

15   actions designed to acquire control of the Debtor.

16        11.    The Debtor learned that Chaucer had plans to move into the United States market

17   and appeared interested in taking over the Debtor as a launching platform for its domestic

18   operations. Under the guise of intending to invest $1 million in the Debtor, Chaucer flew in a

19   team from KPMG from the U.K. to perform due diligence on the Debtor on June 2, 2014.

20   Chaucer completed its due diligence in late June 2014 and had promised to invest another

21   $400,000 in equity. For months, the Debtor expected an investment and equity contribution.

22   Then, in August 2014, Chaucer revealed its true intention for a hostile takeover of the Debtor

23   through an out-of-court assignment for the benefit of creditors, through which Chaucer would

24   take 23.33% of the recapitalized company, with other significant ownership stakes for the

25   Debtor's two largest secured creditors and a small ownership stake for me, while eliminating the

26   existing equity ownership of the Debtor and returning nothing for unsecured creditors.

27        12.    The Debtor also receives supplies from another supplier, Shandong Searsport

28   Foods, Co., Ltd. ("Searsport"). Separate and apart from the Chaucer litigation, on August 20,

1   2013, Searsport sued the Debtor for a debt of at least $845,661.48, in a lawsuit entitled
2   *Shandong Searsport Foods v. Crunchies Food*, bearing case number 56-2013-00440790-CU-
3   CL-VTA. The parties entered a stipulated settlement with payment plan. The Debtor made
4   payments on over half of the amount owed under the settlement and payment plan but was
5   unable to raise funds and defaulted because of the fallout with Chaucer.

6       13.    In order to preserve the Debtor's estate, the value as a going concern, and
7   recovery for all creditors and stakeholders, the Debtor determined in its reasonable business
8   judgment that filing for chapter 11 bankruptcy was in the best interest of the estate and its
9   creditors.

10      14.    In December 2013, the Debtor received a loan for $1.5 million from Seung
11  Chung, as Trustee of the Chung Family Trust ("Chung"), and then an additional $500,000 in
12  February 2014, which loan is allegedly secured by all of the Debtor's assets (the "Chung
13  Loan"). A UCC-1 financing statement for the Chung Loan was filed with the California
14  Secretary of State on December 20, 2013. The purpose of the loan was to grow and expand the
15  Debtor's business.

16      15.    The Debtor received two loans in the amounts of $300,000 and $500,000 in 2010
17  and a third loan in the amount of $4.2 million in October 2011 for a total loan amount of $5
18  million from the Donald Delaski Revocable Trust, Dated December 14, 2000 ("Delaski"), which
19  loan is allegedly secured by all of the Debtor's assets (the "Delaski Loan"). The loan was
20  originally unsecured but was renegotiated for a lower interest rate and made secured in January
21  2014. A UCC-1 financing statement for the Delaski Loan was filed with the California
22  Secretary of State on March 11, 2014. The purpose of the loan was also to grow and expand the
23  Debtor's business. Delaski is also a member of the Debtor with a $2 million equity investment.
24  The Chung Loan has priority over the Delaski Loan.

25      16.    Wells Fargo Bank has a lien and claim in the amount of approximately $12,000
26  secured by one forklift owned by the Debtor, which the Debtor values at $5,000, based on prices
27  of used forklifts on the market. The Debtor proposes to continue to make regular monthly loan
28  payment of $289 per month as adequate protection.

17.     Prior to the Petition Date, the Debtor entered into one or more warehouse agreements (the "Agreements") with CH Robinson ("CHR"), pursuant to which CHR agreed to store goods delivered by the Debtor ("Stored Goods") and provide certain warehouse services.

18.     The Agreement provides, among other things, that CHR shall have a general warehouse lien for all lawful charges for storage and preservation of the Stored Goods and for all unpaid obligations of the Debtor. CHR contends that its possessory lien on the Stored Goods has priority over any other security interests asserted by any creditor against the Stored Goods. As of the Petition Date, CHR contends that its claim (the "CHR Claim"), in the total amount due and payable by the Debtor under the Agreements, was approximately $150,000, while the Debtor contends it was approximately $105,000. As of the Petition Date, Debtor contends that the Stored Goods had a market value of approximately $500,000, substantially in excess of the CHR Claim

19.     In May 2014, the Debtor's business as a going concern was valued at approximately $14,880,000 by using a discounted cash flow approach methodology. The valuation calculated the present value of the proposed cash flows to investors along with the present value of the balance sheet equity in year 2019 based on James Lacey's forecast of sales and related expenses for the years 2014 through 2019, then applied a 19.5% discount factor. Attached as Exhibit "2" to the annexed declaration of Richard G. Boyer, CPA is a true and correct copy of valuation. The value of the Debtor's trademark, brand, and intellectual property is unknown.

20.     On September 8, 2014, the Debtor and CHR entered into a stipulation for treatment of CHR's warehouse lien and turnover of property of the estate to the Debtor. The stipulation is the subject of a separate motion filed by the Debtor on September 8, 2014. The stipulation provides CHR with adequate protection, a senior lien, and payments for the Stored Goods at its warehouses.

21.     Prepetition, the Debtor relied on representations from Chaucer that financing and capital infusions would be provided, but, after extensive cooperation in due diligence, Chaucer refused to fund the financing and capital and instead presented the Debtor with a takeover offer

1   that was wholly unacceptable. With the promised financing and capital pulled out from under it,
2   the Debtor had no choice but to file for chapter 11 reorganization to protect its estate and all
3   stakeholders. Since the Petition Date, the Debtor has been in serious need of financing to
4   purchase supplies, fill orders, pay warehouses, meet payroll, and continue to operate its business
5   as a going concern. Every cash collateral budget that the Debtor has presented to the Court
6   contemplates and relies on financing in the near term. Without the financing, the Debtor will
7   almost certainly have to shut down its operations, and its going-concern value will be
8   eviscerated in a liquidation.

9       22.     The Debtor has canvassed other potential financing options. At the present time,
10  all or substantially all of the Debtor's assets are encumbered by the security interests. Based on
11  the Debtor's search and review of the current market, it is clear that, as is typical in a Chapter 11
12  case, no lender is willing to provide the Debtor with the needed funding without a senior
13  secured priming lien or, in the absence of such priming lien, repayment terms and conditions on
14  the Debtor's reorganization that are so outrageous as to be decidedly beyond what the Debtor
15  could agree to in its fiduciary duty to the estate. Most lenders who would even consider
16  providing a chapter 11 debtor with financing require a senior lien against all assets to securitize
17  that loan.

18      23.     The Debtor seeks approval of financing offered to it by NH Foods, LLC, or an
19  affiliate thereof (the "Postpetition Lender"). In the first three weeks of the case, the Debtor has
20  investigated financing from several sources and has not been able to acquire financing on terms
21  more favorable as those offered by the Postpetition Lender, which terms have been negotiated at
22  arms' length. It is the Debtor's reasonable business judgment that the proposed financing is in
23  the best interest of the estate and necessary to avoid immediate and irreparable harm.

24      24.     The loan (the "Postpetition Debt") is in the amount of up to $600,000, at 6%
25  interest per annum, compounded annually, with a default interest rate of 12%. The Postpetition
26  Debt will be *pari passu* with the Chung Loan and secured by a lien on postpetition collateral
27  that is otherwise senior to the liens in existence on the Petition Date pursuant to 11 U.S.C. §
28  364(d) as well as administrative priority pursuant to 11 U.S.C. § 364(c)(1), and the Postpetition

34

1  Lender's liens and administrative priority claim will remain in full force and effect

2  notwithstanding any subsequent conversion or dismissal of the case.[4]

3       25.    The full terms of the postpetition financing is set forth in the proposed order.  A

4  true and correct copy of the proposed form of order granting the Motion and approving the

5  Stipulation is attached as Exhibit "1" to this declaration.  Creditors and parties in interest

6  wishing to know the exact terms of the financing should read Exhibit "1" hereto.  To the extent

7  that there are any inconsistencies or uncertainties between the terms in the proposed order and

8  this Motion, the terms in the proposed order control.

9       26.    The requested relief pertaining to the Debtor's obtaining financing does not (or

10  does) contain any of the following provisions:

| Provision | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | Yes |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | Yes |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor are authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No [but includes general release for post-petition claims and causes of action] |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |

---

[4] The warehouse lien and prepetition claim of CHR in the approximate amount of
$105,000 to $150,000 is excluded from this treatment, and CHR retains its senior secured
possessory lien on the collateral in its possession in its warehouses.

| **Provision** | |
|---|---|
| | |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the Debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | Yes [but *pari passu* with Chung Loan]; both existing secured lenders consent to the lien to be granted to Postpetition Lender |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | Yes |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | Yes |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

27.     The Debtor hereby provides the following disclosures with respect to the financing:

| Provision | |
|---|---|
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | Yes,     with consent     of |

|  | existing lenders. |
|---|---|
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | No. |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | No. |
| A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | Yes. |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | Yes. |
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | No. |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | Yes. |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | Yes. |
| The indemnity of an entity | No. |
| A release, waiver, or limitation of any right under Section 506(c) | No. |
| The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | Yes, as to proceeds of such claims and/or causes of action. |

28.     In stark contrast to its view of Chaucer, the Debtor is excited at the possibilities of teaming with Postpetition Lender's affiliates. To be clear, the postpetition financing doesn't do anything to bind the Debtor in this regard. However, the optionality Postpetition Lender's interest provides is a significantly positive development for the Debtor and its constituents.

1  Indeed, Debtor believes this is part and parcel of why the Debtor's secured lenders have

2  consented to being primed by Postpetition Lender.

3      29.     It is critical that this Motion be heard on or before September 12, 2014.  The

4  disruption in the Debtor's flow of funds by virtue of operational challenges experienced as a

5  result of the commencement of this bankruptcy case have made it impossible for the Debtor to

6  obtain the necessary raw materials to complete orders for its largest customers.  Delivery dates

7  have been extended to the week of September 15, 2014, but the Debtor is advised that its

8  inability to satisfy its orders in a timely fashion will result in the cancellation of such orders.

9  The cancellation of the Debtor's existing orders will devastate the business and will greatly

10 hinder the Debtor's reorganization efforts.  In order to fulfill its existing orders, the Debtor must

11 order and pay for product by Friday, September 12, 2014.  As such, the timing of the hearing on

12 this Motion is of vital importance.

13     30.     The financing is in the best interest of the estate and that the Court should grant

14 the Motion and approve the financing for an interim period on an emergency basis.

15     31.     Based on the foregoing, I respectfully request that the Court grant this Motion.

16 I declare under penalty of perjury that the foregoing is true and correct.

17 Executed this 9th day of September 2014, at Westlake Village, California.

20                              _____/s/ James Lacey_____
                                    JAMES LACEY
21                                     Declarant

# DECLARATION OF RICHARD G. BOYER

I, RICHARD G. BOYER, hereby declare as follows:

1.    I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.    I am a certified public accountant and managing member of Gensley Group Limited LLC, a full service accounting firm licensed in California.  I have over 40 years of experience as a CPA.   Attached hereto as Exhibit "3" is a true and correct copy of my professional resume.

3.    I make this declaration in support of the *Emergency Motion for an Interim Order (A) Authorizing Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Granting Liens, Including Priming Liens and Superpriority Claims to Postpetition Lender Pursuant to Section 364 of the Bankruptcy Code, and (C) Providing Adequate Protection to Prepetition Lenders* (the "Motion") filed by Crunchies Food Company, LLC (the "Debtor").

4.    Prior to the Debtor filing for bankruptcy on August 15, 2014, I rendered financial accounting services for the Debtor.

5.    In May 2014, I prepared a valuation of the Debtor's business as a going concern of $14,880,000.  Attached hereto as Exhibit "2" is the valuation.

6.    I used a discounted cash flow approach for the methodology of the valuation. I calculated the present value of the proposed cash flows to investors along with the present value of the balance sheet equity in year 2019 based on James Lacey's forecast of sales and related expenses for the years 2014 through 2019.  I then applied a discount factor of 19.5% to render a valuation of $14,880,000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___^th day of September, 2014, at Costa Mesa, California.


_____
RICHARD G. BOYER, CPA
Declarant

## DECLARATION OF WILLIAM R. VOSS

I, WILLIAM R. VOSS, hereby declare as follows:

1. I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2. I make this declaration in support of the motion to which it is attached. Defined terms used herein have the same meanings as ascribed to them in the Motion.

3. I was the founder, chairman, and chief executive officer of Natural Nutrition Group (NNG), a company I led in acquiring and developing brands in the natural food industry.

4. Between 1996 and 1999, NNG acquired several companies, including Health Valley, creating one of the largest natural food manufacturers in the U.S. In May 1999, NNG was sold to the Hain Celestial Group, a public company with interests in the natural food industry.

5. Prior to forming NNG, I was chief executive officer of McCain Foods, a large privately owned frozen food manufacturer. I also served as president, chief operating officer and director of Pilgrim's Pride Corporation, a publicly traded food processor. In addition, I was a principal with Booz, Allen & Hamilton, management consultants, where I advised Fortune 500 clients in the consumer products and retailing industries. I have also served as Chairman of Nash Finch Company, a $5 billion food wholesaler and retailer.

6. NC Foods LLC is an affiliate of Lake Pacific Partners, a leading private equity firm focused exclusively on the food and consumer products industry. A selection of Lake Pacific's relevant portfolio companies have included:

   a. *Teepak*, a leading manufacturer of cellulose and fibrous casings for the processed meat industry with about $200 million in revenue.

   b. *Maxi*, a manufacturer of branded processed, frozen chicken products marketed under the Yummy brand. Its Dino Buddies are the top selling children's chicken nugget in the US.

   c. *Cal-Pacific Specialty Foods*, in San Jose, CA, is one the largest industrial processor of strawberries in North America.

40

d. ***Mercer Foods***, based in Modesto, CA, is a recognized leader in freeze drying a range of fruits and vegetables. It markets products to retailers, restaurant chains and industrial customers, and has a broad range of capabilities that include dehydration, client product development, sourcing, dicing, milling and screening and retail -ready packaging capabilities for finished products.

7.    Cal-Pacific Specialty and Mercer Food, in particular, are potential strategic resources for the Debtor.

8.    Mercer, in particular, not only sells raw ingredients that Debtor requires but it actually has the means to package Debtor's products on a contract basis. While not an element of the proposed financing, the prospect that Debtor may be able to do business with Mercer is particularly attractive, especially due to Debtor's urgent need to replenish inventories in order to meet near term demand.

9.    To be clear, Debtor is not required to buy from Mercer (or any of its affiliates) nor are they required to sell to Debtor. However, the parties have been discussing doing business in the ordinary course, which could be very beneficial to Debtor.

10.    Postpetition Lender's interest in serving as a DIP lender in this case is not driven by the desire to earn significant interest and fees. Indeed, the reasonableness of the terms of the postpetition financing is some indication of this. Rather, Postpetition Lender's primary interest in Debtor is as an acquisition target or investment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___th day of September, 2014, at _____.

_____
WILLIAM R. VOSS
Declarant

**Exhibit 1**

1  DAVID L. NEALE (SBN 141225)
   J.P. FRITZ (SBN 245240)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Blvd., Suite 1700
3  Los Angeles, California 90067
   Telephone: (310) 229-1234
4  Facsimile: (310) 229-1244
   Email: DLN@LNBYB.COM; JPF@LNBYB.COM
5
   Proposed Attorneys for Chapter 11Debtor
6  and Debtor in Possession

7
                   **UNITED STATES BANKRUPTCY COURT**
8
                   **CENTRAL DISTRICT OF CALIFORNIA**
9
                        **SANTA BARBARA DIVISION**
10
   In re:                              ) Case No.: 9:14-bk-11776-PC
11                                      )
   CRUNCHIES FOOD COMPANY, LLC,         )
12                                      ) Chapter 11 Case
                                        )
          Debtor and Debtor in Possession.  )
13                                      ) **INTERIM ORDER (A) AUTHORIZING**
                                        ) **POSTPETITION FINANCING**
14                                      ) **PURSUANT TO SECTION 364 OF THE**
                                        ) **BANKRUPTCY CODE, (B) GRANTING**
15                                      ) **LIENS, INCLUDING PRIMING LIENS**
                                        ) **AND SUPERPRIORITY CLAIMS TO**
16                                      ) **POSTPETITION LENDER PURSUANT**
                                        ) **TO SECTION 364 OF THE**
17                                      ) **BANKRUPTCY CODE, AND (C)**
                                        ) **PROVIDING ADEQUATE**
18                                      ) **PROTECTION TO PREPETITION**
                                        ) **LENDERS**
19                                      )
                                        ) Date:
20                                      ) Time:
                                        ) Place:
21                                      )
                                        )
22                                      )
                                        )
23  _____     )

24       This matter came before this Court on the motion (the "Motion") of Crunchies Food

25  Company, LLC, debtor and debtor-in-possession in the above-captioned Chapter 11 case

26  ("Debtor") (A) seeking authority, pursuant to Bankruptcy Code §§ 105, 361, 364(c)(1),

27  364(c)(2), and 364(d), and Bankruptcy Rules 2002 and 4001, to grant a lien on property not

28  otherwise secured by a lien and to obtain a priming secured, super-priority debtor-in-

                                    1

possession term loan, as described in the Postpetition Documents in the amount of $600,000 from the Postpetition Lender under the Postpetition Documents; and (B) requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") be held for this Court to consider entry of this interim order ("Interim Order") authorizing Debtor, on an interim basis, to immediately borrow up to $600,000 of the total $600,000, as being immediately necessary to preserve the Debtor' estates (the "Interim DIP Loan Amount"). Appearances were as noted on the record at the hearing.

The Court having examined the Motion and the responses and objections thereto, if any, having considered offers of proof, evidence, and testimony presented at the Interim Hearing held on September 12, 2014, and upon the representations of counsel for Debtor and other parties in interest, and being otherwise fully advised of the relevant facts and circumstances surrounding the Motion, notice of the hearing on the Motion having been appropriate under the circumstances, and after due deliberation and consideration and good and sufficient cause appearing therefor,

IT IS FOUND AND DETERMINED THAT:

A.    On the Petition Date, Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the Debtor's Case. Debtor has retained possession of its property and continues to operate its business as Debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.    The Court has jurisdiction over the Cases and these proceedings pursuant to 28 U.S.C. § 1334. Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).    Venue over this Motion is proper under 28 U.S.C. § 1409(a).

C.    Debtor needs to incur Postpetition Debt as provided herein in order to maximize the value of its estate.

D.    Debtor is unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) sufficient to finance its operations or the administration of this Case. Debtor is likewise unable to obtain credit allowable merely under Bankruptcy Code

2

1 § 364(c)(1), (c)(2) or (c)(3). Debtor is likewise unable to obtain credit under Bankruptcy

2 Code § 364(d) on terms more favorable than those offered by Postpetition Lender.

3          E.      The terms of the Postpetition Debt have been negotiated at arm's

4 length, and the Postpetition Debt is being extended in good faith, as that term is used in

5 Bankruptcy Code § 364(e).

6          F.      The terms and conditions of the Postpetition Documents are fair and

7 reasonable, the best available under the circumstances, reflect the Debtor's exercise of

8 prudent business judgment consistent with its fiduciary duties, and are supported by

9 reasonably equivalent value and consideration.

10          G.      Under the circumstances of this Case, the entry of this Order is in the

11 best interest of Debtor's estate and its creditors.

12          H.      The notice provided by Debtor of the Motion, the Interim Hearing, and

13 the entry of this Order satisfy the requirements of Fed. R. Bankr. P. 2002, 4001(b) and (c) and

14 9014 and Bankruptcy Code §§ 102(1), 363, 364(c) and (d) and were otherwise sufficient and

15 appropriate under the circumstances.

16                  WHEREFORE, IT IS HEREBY ORDERED THAT:

17          1.      Defined Terms.    Unless otherwise indicated, all capitalized

18 terms used as defined terms herein have the meanings ascribed thereto in Exhibit A attached

19 hereto and by this reference are made a part hereof.

20          2.      Effect of Order.  This Order shall constitute findings of fact and

21 conclusions of law pursuant to Fed. R. Bankr. P. 7052 and shall take effect and be fully

22 enforceable as of the date of entry of this Order on the Court's docket.

23          3.      Authorization To Incur Postpetition Debt.

24                  (a)      Postpetition Documents.   Debtor is hereby authorized

25 and has agreed to: (1) execute the Postpetition Documents, including all documents that

26 Postpetition Lender finds reasonably necessary to implement the transactions contemplated by

27 the Postpetition Documents; (2) perform its obligations under and comply with all of the

28 terms and provisions of the Postpetition Documents and this Order; and (3) pay the

3

Postpetition Charges, including interest, fees and costs. Upon execution and delivery thereof, the Postpetition Documents shall constitute valid and binding obligations of Debtor enforceable in accordance with their terms. To the extent there exists any conflict among the terms of the Motion, the Postpetition Documents, and the terms of this Order, this Order shall govern and control.

(b)    Permitted Uses of Postpetition Debt. Debtor is authorized and has agreed to incur Postpetition Debt solely in accordance with the terms and provisions of this Order and the attached DIP Budget. If Postpetition Lender advances monies to Debtor and Debtor uses such monies other than in accordance with the terms or provisions of this Order and/or the DIP Budget, such advances shall be considered Postpetition Debt for purposes of this Order.

(c)    Additional Terms of Postpetition Debt.

(i)    Maximum Amount. The maximum principal amount of Postpetition Debt outstanding shall not at any time exceed the DIP Commitment.

(ii)    Interest. All amounts outstanding under the DIP Facility will bear interest at 6% per annum compounded annually, payable at the Maturity Date, with a default interest at 12%.

(iii)    Maturity. The Postpetition Debt shall mature and be due and payable in full by Debtor on the Termination Date.

(d)    Superpriority Administrative Expense Status; Postpetition Liens.

(i)    The Postpetition Debt is hereby granted superpriority administrative expense status under Bankruptcy Code § 364(c)(1), with priority over all costs and expenses of administration of the Cases that are incurred under Bankruptcy Code §§ 503(b) and 507(b), and the Postpetition Debt is entitled to the protections of

4

1        Bankruptcy Code § 364(e). For the sake of clarity, the priority

2        described in this paragraph is senior to that granted by separate order to

3        the Prepetition Lenders.

4                (ii)     In addition, Postpetition Lender is hereby

5        granted Postpetition Liens, including Priority Liens against the

6        Postpetition Collateral to secure the Postpetition Debt. The

7        Postpetition Liens, including the Priority Liens against the Postpetition

8        Collateral: (1) pursuant to Bankruptcy Code §§ 364(c)(2), (c)(3) and

9        364(d), are Priority Liens, without any further action by Debtor or

10        Postpetition Lender and without the execution, filing or recordation of

11        any financing statements, security agreements, mortgages or other

12        documents or instruments; and (2) shall remain in full force and effect

13        notwithstanding any subsequent conversion or dismissal of the Case.

14        For the sake of clarity, the priority described in this paragraph is senior

15        to that granted to Delaski and *pari passu* to that granted to Chung, in

16        each case by separate order. The relative rights and obligations of

17        Postpetition Lender and Chung are governed by the Intercreditor

18        Agreement.

19                (iii)    Notwithstanding the foregoing, Debtor

20        shall execute and deliver to Postpetition Lender such financing

21        statements, mortgages, instruments and other documents as Postpetition

22        Lender may request from time to time, and any such documents filed

23        by Postpetition Lender shall be deemed filed as of the date of entry of

24        this Order on the Court's docket.

25                (e)    Prohibition Against Additional Debt. Debtor will not

26 incur or seek to incur debt secured by a lien which is equal to or superior to the Postpetition

27 Debt or the Postpetition Liens, or which is given superpriority administrative expense status

28 under Bankruptcy Code § 364(c)(1), unless, in addition to the satisfaction of all requirements

1 of Bankruptcy Code § 364: (1) Postpetition Lender has consented to such order; (2) at the

2 time such an order is entered, there is no Postpetition Debt outstanding; or (3) such credit or

3 debt is first used to pay the Postpetiton Debt in full in cash.

4                 4.      Adequate Protection of the Asserted Interests of Prepetition

5 Lenders. Prepetition Lenders have consented to the relief prayed for herein. To the extent of

6 any diminution in the value of the asserted interest of the Prepetition Lenders in the

7 Prepetition Collateral, if any, the Prepetition Lenders shall be granted replacement liens to the

8 same extent, amount, priority, validity and enforceability as the Prepetition Liens in the

9 Postpetition Collateral ("Replacement Liens"). The Prepetition Lenders' Replacement Liens

10 granted herein are subordinate and subject to the Postpetition Liens granted to Postpetition

11 Lender.

12                 5.      Termination Date; Rights and Remedies.

13                 (a)      Effect of Termination Date.  Unless extended by the

14 Court upon the written agreement of Postpetition Lender, upon the Termination Date without

15 further notice or order of Court, at Postpetition Lender's election, the Postpetition Debt shall

16 be immediately due and payable.

17                 (b)      Rights and Remedies.  Upon three (3) business days'

18 written notice to the Debtor, any Committee, and the Office of the United States Trustee after

19 the occurrence of the Termination Date, the automatic stay shall be modified to the extent

20 necessary to permit:  (i) the Postpetition Lender to take possession and dispose of all

21 Postpetition Collateral without further action by the Court; (ii) the Postpetition Lender to

22 exercise all rights and remedies available to it under the Postpetition Documents and

23 applicable nonbankruptcy law; and (iii) the Debtor to cooperate with the Postpetition Lender

24 in the exercise of its rights and remedies under the Postpetition Documents and applicable

25 nonbankruptcy law, including, without limitation, by filing a motion to retain one or more

26 agents to sell, lease or otherwise dispose of the Postpetition Collateral upon the request and

27 subject to terms and conditions acceptable to the Postpetition Lender.

28

6

1                                (c)     Debt Acquisition Right.  Within five (5) business days

2   after the occurrence of a Termination Date, Delaski shall have the absolute right to acquire,

3   through an assignment, all of Postpetition Lender's right, title and interest in the Postpetition

4   Debt, and Postpetition Liens securing the same, by tendering to the Postpetition Lender, in

5   good funds, a sum equal to such Postpetition Debt, or such other amount as Postpetition

6   Lender shall agree to accept in consideration for the acquisition of the Postpetition Debt.

7   Upon the completion of such assignment, Delaski shall hold all of Postpetition Lender's rights

8   and obligations under the Postpetition Loan Documents and under this Interim Order, in the

9   place and stead of Postpetition Lender.  For the sake of clarity, any such assignment shall also

10  consitute Delaski's assumption of the Intercreditor Agreement.

11                         6.     Application of Sale Proceeds.  All proceeds from sales or other

12  dispositions of all or any portion of the Postpetition Collateral other than in the ordinary

13  course shall be remitted to Postpetition Lender to repay the Postpetition Debt pursuant to the

14  terms of the Postpetition Documents, unless otherwise agreed by the Postpetition Lender.

15                         7.     No Marshaling.    Neither the Postpetition Lender nor the

16  Postpetition Collateral shall be subject to the doctrine of marshaling.

17                         8.     Postpetition Charges.   All Postpetition Charges are hereby

18  approved and shall be promptly paid by Debtor in accordance with this Order and the

19  Postpetition Documents, without need for filing an application with the Court for approval or

20  payment of the Postpetition Charges.

21                         9.     Conflicts Between Order, Motion, and Postpetition Documents.

22  To the extent there exists any conflict among the terms of the Motion, the Postpetition

23  Documents and this Order, this Order shall govern and control.

24                         10.    Modification of Stay.   The automatic stay imposed by

25  Bankruptcy Code § 362 is hereby modified with respect to the Postpetition Lender solely to

26  the extent necessary to effectuate the provisions of this Order.

27                         11.    No Waiver.  Postpetition Lender shall not be deemed to have

28  suspended or waived any of its rights or remedies under this Order, the Postpetition

                                              7

Documents, the Bankruptcy Code, or applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of the Postpetition Lender, as applicable, and directed to Debtor. No failure of the Postpetition Lender to require strict performance by Debtor (or by any Trustee) of any provision of this Order shall waive, affect or diminish any right of the Postpetition Lender thereafter to demand strict compliance and performance therewith, and no delay on the part of the Postpetition Lender in the exercise of any right or remedy under this Order, the Postpetition Documents, the Bankruptcy Code, or applicable nonbankruptcy law shall preclude the exercise of any right or remedy.

12. "Responsible Person." By taking any actions pursuant to this Order, Postpetition Lender shall not: (a) be deemed to be in control of the operations or liquidation of Debtor; or (b) be deemed to be acting as a "responsible person" with respect to the operation, management or liquidation of Debtor.

13. Release. Upon the date that the Postpetition Debt is paid in full in cash and prior to the release of the Priority Liens against the Postpetition Collateral, Debtor and the Postpetition Lender shall execute a mutual general release of any and all claims and causes of action that could have been asserted or raised under or in connection with the Postpetition Documents.

14. Amendments. Debtor and Postpetition Lenders may enter into amendments or modifications of the Postpetition Documents without further notice and hearing or order of this Court; provided, that (a) such modifications or amendments do not materially and adversely affect the rights of any creditor or other party-in-interest and (b) notice of any such amendment or modification is filed with this Court.

15. Binding Effect. This Order shall be binding on all parties in interest in the Cases and their respective successors and assigns, including any Trustee, except that any Trustee shall have the right to terminate this Order after notice and a hearing. If, in accordance with Bankruptcy Code § 364(e), this Order does not become a final nonappealable order, if a Trustee terminates this Order, or if any of the provisions of the Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court,

8

1   such termination or subsequent order shall not affect: (a) the stipulations, representations, and
2   findings contained in this Order and the relief granted by and the releases contained in this
3   Order; and (b) the priority, validity, enforceability or effectiveness of any lien, security
4   interest or other benefit or claim authorized hereby with respect to Postpetition Debt incurred
5   prior to the effective date of such termination or subsequent order. All such liens, security
6   interests, claims and other benefits shall be governed in all respects by the original provisions
7   of this Order, and Postpetition Lender shall be entitled to all the rights, remedies, privileges
8   and benefits granted hereto, including the liens and priorities granted herein, with respect to
9   the Postpetition Debt. Except as otherwise explicitly set forth in this Order, no third party is
10  intended to be, or shall be deemed to be, a third party beneficiary of this Order.

11              16.     Survival. The provisions of this Order, and any actions taken
12  pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the
13  event of any conflict with, any order which may be entered in the Case: (a) confirming any
14  chapter 11 plan, (b) converting the Case to a case under chapter 7 of the Bankruptcy Code, (c)
15  dismissing the Case, (d) withdrawing of the reference of the Case from this Court, or (e)
16  providing for abstention from handling or retaining of jurisdiction of the Case in this Court.
17  The terms and provisions of this Order, including, without limitation, the rights granted
18  Postpetition Lender under Bankruptcy Code §§ 364(c) and (d), shall continue in full force and
19  effect until all of the Postpetition Debt is indefeasibly paid in full in cash and discharged.

20

21

22                                      # # #

23

24

25

26

27

28

                                         9

## EXHIBIT A

## DEFINED TERMS

1.    ***Bankruptcy Code***.  The United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*), as amended, and any successor statute.   Unless otherwise indicated, all statutory section references in this Order are to the Code.

2.    ***Case***.  The chapter 11 case or any superseding chapter 7 case of the Debtor.

3.    ***Chung***.  The Provident Trust Group, LLC and The Chung Family Trust

4.    ***Delaski***.  The Donald Delaski Revocable Trust

5.    ***DIP Budget***.  The budget attached hereto as Exhibit C or any amended budget approved by Postpetition Lender in its sole and absolute discretion.

6.    ***DIP Commitment***.  The amount of $600,000.

7.    ***Event of Default***.  At Postpetition Lender's election, (a) a Debtor's failure to comply with the covenants or perform any of its obligations in strict accordance with the terms of this Order; and (b) the occurrence and continuance of any "Event of Default" (as that term is defined in the Postpetition Documents).

8.    ***Intercreditor Agreement***.   That certain Intercreditor Agreement between Postpetition Lender and Chung, executed as of September __, 2014.

9.    ***Obligations.***   The "Obligations," as that term is defined in the Documents.

10.    ***Permitted Priority Liens***.  Collectively, liens in favor of third parties upon the Prepetition Collateral, which third-party liens, as of the Petition Date: (1) had priority under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the Petition Date.

11.    ***Person***.   Any natural person, corporation, firm, joint venture, partnership, limited liability company, association, enterprise, trust or other entity or organization, or any government or political subdivision or any agency, department or instrumentality thereof.

12.    ***Petition Date***.  August 15, 2014.

13.    ***Postpetition Charges***.  Interest at the applicable rate of interest under the Postpetition Documents and all fees, costs, and expenses provided for in the Postpetition Documents, including those incurred by Postpetition Lender in connection with the Postpetition Debt.

10

14.    **Postpetition Collateral.** All of the real and personal property of Debtor of any description whatsoever, wherever located and whenever arising or acquired, including all cash, accounts, inventory, equipment, fixtures, chattel paper, general intangibles (excluding claims[**, but including recoveries**] under Bankruptcy Code §§ 544, 545, 547, 548, 549, 550, 551, and 553), all leaseholds, all commercial torts, all interests in any joint venture, all liquor licenses and other licenses and permits, and all other "Collateral" (as that term is defined in the Postpetition Documents), and all proceeds, rents, issues, profits and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any of the foregoing.

15.    **Postpetition Debt.** All indebtedness or obligations of Debtor to Postpetition Lender incurred on or after the Petition Date pursuant to this Order or otherwise, including all Obligations.

16.    **Postpetition Documents.** The Loan and Security Agreement by and between Debtor and Postpetition Lender, as amended, modified, supplemented, replaced or refinanced from time to time, a copy of which is attached to this Order as Exhibit B, and any other related or ancillary documents between Debtor and Postpetition Lender. Any capitalized term used in this Exhibit B but not defined herein shall have the meaning ascribed to it in Exhibit B.

17.    **Postpetition Lender.** NC Foods, LLC or an affiliate thereof.

18.    **Postpetition Liens.** Priority Liens in the Postpetition Collateral.

19.    **Prepetition Collateral.** All of the "Collateral" (as that term is defined in the Prepetition Documents) existing as of the Petition Date.

20.    **Prepetition Debt.** (a) All indebtedness or obligations under the Prepetition Documents as of the Petition Date, including all Obligations under the Prepetition Documents, and all fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Documents.

21.    **Prepetition Documents.** Those agreements between Debtor and Prepetition Lenders governing and evidencing the Prepetition Debt.

22.    **Prepetition Lenders.** Chung and Delaski.

23.    **Prepetition Liens.** Prepetition Lenders' asserted security interests in the Prepetition Collateral under the Prepetition Documents.

24.    **Priority Liens.** Liens which are first priority, properly perfected, valid and enforceable security interests, which are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and which are otherwise unavoidable and not subject to recharacterization or subordination pursuant to any provision of the Code, any agreement, or applicable nonbankruptcy law.

25.    **Replacement Liens.** The "Replacement Liens," as that term is defined in the paragraph 4 of this Order.

26.     **Termination Date**.  The earlier to occur of: (a) the date on which Postpetition Lender provides, via electronic mail, facsimile or overnight mail, written notice to the Debtor, counsel for Debtor, counsel for any Committee and the Office of the United States Trustee of the occurrence and continuance of an uncured Event of Default; (b) the date on which a sale of all or substantially all of the Postpetition Collateral is consummated; and (c) the Maturity Date.

27.     **Trustee**.  Any trustee appointed or elected in the Cases.

12

1                              EXHIBIT B

2

3                  LOAN AND SECURITY AGREEMENT

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

EXHIBIT C

2

3

DIP BUDGET

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

**Exhibit 2**

**Crunchies Food Company, LLC**

Forecasted Valuation Based upon Discounted Cash Flows

Exhibit 2

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| Investment | (9,082,785) | (10,789,480) | - | - | - | - | - |
| Distributions | - | - | - | - | - | 2,000,000 | 4,000,000 |
| Net Cash Flow | (9,082,785) | (10,789,480) | - | - | - | 2,000,000 | 4,000,000 |

| | |
|---|---|
| Capitalization Rate | 19.5% |

| | |
|---|---|
| Net Present Value of Cash Flows | 1,836,000 |
| Present Value of Future Net Equity | 13,044,000 |
| Total Value of Enterprise | 14,880,000 |

**Crunchies Food Company, LLC**
Forecasted Consolidated Balance Sheet
Exhibit 2 - A

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | |
| Cash - Other | 170,631 | 524,890 | 3,350,772 | 2,364,165 | 2,797,737 | 2,633,274 | 2,652,903 |
| Accounts Receivable | 402,630 | 2,639,602 | 5,932,802 | 10,185,309 | 16,370,795 | 25,030,452 | 36,288,006 |
| Inventory | 2,059,770 | 4,070,415 | 3,486,833 | 5,811,417 | 8,453,000 | 11,834,167 | 15,384,417 |
| Prepaid Expenses | 197,644 | 327,136 | 327,136 | 327,136 | 327,136 | 327,136 | 327,136 |
| Total Current Assets | 2,830,675 | 7,562,043 | 13,097,543 | 18,688,027 | 27,948,668 | 39,825,029 | 54,652,462 |
| | | | | | | | |
| **Fixed Assets** | | | | | | | |
| Auto/ Transport Equipment | | 39,928 | 39,928 | 39,928 | 39,928 | 39,928 | 39,928 |
| Furniture & Fixtures | 282,777 | 269,564 | 269,564 | 269,564 | 269,564 | 269,564 | 269,564 |
| Computers & Presentation Equipment | 216,765 | 216,765 | 216,765 | 216,765 | 216,765 | 216,765 | 216,765 |
| Improvements | | - | - | - | - | - | - |
| Machinery & Equipment | 218,112 | 218,112 | 318,112 | 568,112 | 818,112 | 1,068,112 | 1,318,112 |
| | | - | - | | | | |
| Less Accumulated Depreciation | (237,670) | (342,736) | (463,360) | (619,699) | (811,752) | (1,039,519) | (1,303,000) |
| Total Property & Equipment | 479,984 | 401,633 | 381,009 | 474,670 | 532,617 | 554,850 | 541,369 |
| | | | | | | | |
| **Other Assets** | | | | | | | |
| Security Deposits | 18,902 | 16,702 | 16,702 | 16,702 | 16,702 | 16,702 | 16,702 |
| Intangible Assets | 491,067 | 491,067 | 491,067 | 491,067 | 491,067 | 491,067 | 491,067 |
| Less Accumulated Amortization | (185,120) | (255,273) | (325,425) | (395,578) | (465,730) | (535,883) | (606,035) |
| Total Other Assets | 324,849 | 252,496 | 182,344 | 112,191 | 42,039 | (28,114) | (98,266) |
| | | | | | | | |
| **Total Assets** | 3,635,508 | 8,216,171 | 13,660,895 | 19,274,888 | 28,523,325 | 40,351,766 | 55,095,565 |
| | | | | | | | |
| **Current Liabilities** | | | | | | | |
| Accounts Payable | 751,510 | 2,146,506 | 3,486,833 | 4,649,125 | 5,969,917 | 7,660,500 | 9,435,625 |
| Members' Short Term Loans | | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Accrued Expenses | 142,476 | 243,309 | 243,309 | 243,309 | 243,309 | 243,309 | 243,309 |
| Line of Credit | | 1,300,000 | 3,000,000 | 2,000,000 | 1,000,000 | - | - |
| Note Payable - Wells Fargo | 9,185 | - | - | - | - | - | - |
| Notes Payable - PNC Equipment | | 13,001 | 5,129 | - | - | - | - |
| Total Current liabilities | 903,171 | 3,727,816 | 6,760,271 | 6,917,434 | 7,238,226 | 7,928,809 | 9,703,934 |
| | | | | | | | |
| **Long Term Liabilities** | | | | | | | |
| Accounts Payable | 2,234,429 | - | - | - | - | - | - |
| DeLaski Loan | 5,000,000 | - | - | - | - | - | - |
| Kevin Park Loan | 1,531,493 | - | - | - | - | - | - |
| Ned Verjec Loan | | - | - | - | - | - | - |
| Total Long Term Liabilities | 8,765,922 | - | - | - | - | - | - |
| | | | | | | | |
| **Member's Equity** | | | | | | | |
| Membership Units | 9,082,785 | 19,872,265 | 19,872,265 | 19,872,265 | 19,872,265 | 19,872,265 | 19,872,265 |
| Distributions paid | - | - | - | - | - | (2,000,000) | (6,000,000) |
| Retained Earnings | (15,116,370) | (15,383,910) | (12,971,641) | (7,514,811) | 1,412,834 | 14,550,692 | 31,519,366 |
| Total Stockholders' Equity | (6,033,585) | 4,488,355 | 6,900,624 | 12,357,454 | 21,285,099 | 32,422,957 | 45,391,631 |
| | | | | | | | |
| **Total Liabilities & Equity** | 3,635,508 | 8,216,171 | 13,660,895 | 19,274,888 | 28,523,325 | 40,351,766 | 55,095,565 |

-1-

**Crunchies Food Company, LLC**
Statement of Income and Cash Flows
Exhibit 2 - B

| | 2013 | % | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | |
| Sales | 6,767,383 | 100.00% | 21,612,959 | 41,842,000 | 69,737,000 | 101,436,000 | 142,010,000 | 184,613,000 |
| Discounts & returns | (1,966,748) | -29.06% | (5,171,489) | (9,948,351) | (16,580,664) | (24,117,416) | (33,764,288) | (43,893,574) |
| Total Revenues | 4,800,635 | 70.94% | 16,441,470 | 31,893,649 | 53,156,336 | 77,318,584 | 108,245,712 | 140,719,426 |
| | | | | | | | | |
| **Cost of Sales** | | | | | | | | |
| Cost of Goods Sold | 4,067,761 | 60.11% | 10,597,730 | 20,921,000 | 34,868,500 | 50,718,000 | 71,005,000 | 92,306,500 |
| Warehouse Expense | 791,753 | 11.70% | 1,024,210 | 1,404,729 | 2,115,260 | 2,928,847 | 4,030,651 | 5,330,489 |
| | | | - | | | | | |
| Total Cost of Sales | 4,859,514 | 71.81% | 11,621,941 | 22,325,729 | 36,983,760 | 53,646,847 | 75,035,651 | 97,636,989 |
| | | | | | | | | |
| Gross Margin | (58,879) | -0.87% | 4,819,529 | 9,567,920 | 16,172,576 | 23,671,737 | 33,210,061 | 43,082,437 |
| Gross Profit % | -1% | | 29% | 30% | 30% | 31% | 31% | 31% |
| | | | | | | | | |
| **Operational Costs** | | | | | | | | |
| Sales & marketing expenses | 2,041,632 | 30.17% | 1,715,320 | 2,123,333 | 2,804,810 | 3,573,503 | 4,538,064 | 5,552,830 |
| General & Adminstrative Costs | 1,963,204 | 29.01% | 2,486,026 | 2,960,790 | 3,552,948 | 4,263,538 | 5,542,599 | 7,759,638 |
| Total Operational Costs | 4,004,836 | 59.18% | 4,201,346 | 5,084,123 | 6,357,758 | 7,837,041 | 10,080,662 | 13,312,469 |
| | | | | | | | | |
| Operating Income before Depreciation & Interest | (4,063,715) | -60.05% | 618,183 | 4,483,797 | 9,814,818 | 15,834,896 | 23,129,399 | 29,769,968 |
| | | | | | | | | |
| **Other Expenses** | | | | | | | | |
| Depreciation | 102,522 | 1.51% | 105,066 | 120,624 | 156,338 | 192,053 | 227,767 | 263,481 |
| Amortization | 70,152 | 1.04% | 70,152 | 70,152 | 70,152 | 70,152 | 70,152 | 70,152 |
| Interest Expense | 445,462 | 6.58% | 328,720 | 133,937 | 180,000 | 180,000 | 180,000 | 180,000 |
| Total Other Expenses | 618,136 | 9.13% | 503,939 | 324,713 | 406,491 | 442,205 | 477,919 | 513,634 |
| | | | | | | | | |
| Net Income before allocation for income tax | (4,681,851) | -69.18% | 114,244 | 4,159,084 | 9,408,327 | 15,392,491 | 22,651,479 | 29,256,334 |
| Income Tax | | 0.00% | 176,411 | 1,746,815 | 3,951,498 | 6,464,846 | 9,513,621 | 12,287,660 |
| Net Income after allocation for income tax | (4,681,851) | -69.18% | (62,167) | 2,412,269 | 5,456,830 | 8,927,645 | 13,137,858 | 16,968,674 |
| | | | | | | | | |
| **Cash From Operations** | | | | | | | | |
| Items not affecting cash: | | | | | | | | |
| Depreciation | 102,522 | | 105,066 | 120,624 | 156,338 | 192,053 | 227,767 | 263,481 |
| Amortization | 70,152 | | 70,152 | 70,152 | 70,152 | 70,152 | 70,152 | 70,152 |
| | | | | | | | | |
| (Increase) decrease in Accounts Receivable | | | (2,236,972) | (3,293,200) | (4,252,507) | (6,185,487) | (8,659,657) | (11,257,554) |
| (Increase) decrease in Inventory | | | (2,010,645) | 583,582 | (2,324,583) | (2,641,583) | (3,381,167) | (3,550,250) |
| (Increase) decrease in prepaid expenses | | | (129,492) | - | | | | |
| Increase (decrease) in accounts payable | | | 1,394,996 | 1,340,327 | 1,162,292 | 1,320,792 | 1,690,583 | 1,775,125 |
| Increase (decrease) in accounts payable - Long Term | | | (2,234,429) | - | | | | |
| Increase (decrease) in accrued expenses | | | 100,833 | | | | | |
| Total Cash from Operations | (4,509,177) | | (5,002,857) | 1,233,754 | 268,522 | 1,683,572 | 3,085,537 | 4,269,828 |
| | | | | | | | | |
| **Cash From Investing Activities** | | | | | | | | |
| Auto/ Transportation Equipment Purchases | | | (39,928) | - | | | | |
| Furniture & Equipment purchases | | | 13,213 | - | | | | |
| Computers & Presentation Equipment Purchases | | | - | - | | | | |
| Improvements | | | - | - | | | | |
| Machinery & Equipment Purchases | | | - | (100,000) | (250,000) | (250,000) | (250,000) | (250,000) |
| Intangible Assets & Goodwill purchases | | | - | - | | | | |
| Deposits | | | 2,200 | - | | | | |
| Cash Used for Investing Activities | - | | (24,515) | (100,000) | (250,000) | (250,000) | (250,000) | (250,000) |
| | | | | | | | | |
| **Cash From Financing Activities** | | | | | | | | |
| Shareholders Short Term Loan Proceeds | | | 25,000 | - | | | | |
| Payments on Loan Payable - DeLaski | | | (5,000,000) | - | | | | |
| Payments on Loan Payable - Kevin Park | | | (1,531,493) | - | | | | |
| Payments on Loan Payable - Ned Verjek | | | - | - | | | | |
| Advances on Line of Credit | | | 2,600,000 | 1,700,000 | | | | |
| Payments on Line of Credit | | | (1,300,000) | - | (1,000,000) | (1,000,000) | (1,000,000) | |
| Proceeds from Note Payable - Wells Fargo | | | (9,185) | - | | | | |
| Proceeds from Notes Payable - PNC Equipment | | | 13,001 | (7,872) | (5,129) | | | |
| Member's New Equity Proceeds | | | 10,789,480 | - | | | | |
| Member's Distributions | | | - | - | | | (2,000,000) | (4,000,000) |
| Retained Earnings Adjustment | | | (205,372) | - | | | | |
| Cash from Financing Activities | | | 5,381,431 | 1,692,128 | (1,005,129) | (1,000,000) | (3,000,000) | (4,000,000) |
| | | | | | | | | |
| Change in Cash | | | 354,259 | 2,825,882 | (986,607) | 433,572 | (164,463) | 19,628 |
| Cash - Beginning of Year | | | 170,631 | 524,890 | 3,350,772 | 2,364,165 | 2,797,737 | 2,633,274 |
| Cash - End of Year | 170,631 | | 524,890 | 3,350,772 | 2,364,165 | 2,797,737 | 2,633,274 | 2,652,903 |

**Crunchies Food Company, LLC**
Table of Expenses Assumptions
Exhibit 2 - C

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| **Warehouse Expense** | | | | | | | |
| Labor - Warehouse | 245,496 | 58,676 | 64,544 | 77,452 | 92,943 | 120,826 | 169,156 |
| Labor - Production | 124,136 | 296,696 | 326,366 | 391,639 | 469,966 | 610,956 | 855,339 |
| EDI | 12,410 | 21,850 | 24,035 | 28,842 | 34,610 | 44,994 | 62,991 |
| Quality Control | 12,329 | 10,500 | 11,550 | 13,860 | 16,632 | 21,622 | 30,270 |
| Rent | | 52,464 | 57,710 | 69,252 | 83,103 | 108,034 | 151,247 |
| Transportation | 76,647 | 584,024 | 920,524 | 1,534,214 | 2,231,592 | 3,124,220 | 4,061,486 |
| Warehouse Expense | 320,735 | - | - | | | | |
| **Total Warehouse Expense** | 791,753 | 1,024,210 | 1,404,729 | 2,115,260 | 2,928,847 | 4,030,651 | 5,330,489 |
| *% Increase in Warehouse Expense* | | | | 20% | 20% | 30% | 40% |
| | | | | | | | |
| **Sales & Marketing Expenses** | | | | | | | |
| Salaries - Sales & Marketing | 184,124 | 415,490 | 436,265 | 466,803 | 499,479 | 534,443 | 571,854 |
| Advertising | 889,073 | 131,622 | 138,203 | 147,877 | 158,229 | 169,305 | 181,156 |
| Broker Commissions | 192,630 | 470,828 | 893,022 | 1,488,377 | 2,164,920 | 3,030,880 | 3,940,144 |
| Merchandising | 64,908 | 92,399 | 97,019 | 103,810 | 111,077 | 118,852 | 127,172 |
| Public Relations | 75,600 | 124,196 | 54,000 | 57,780 | 61,825 | 66,152 | 70,783 |
| Trade Shows | 360,300 | 170,360 | 178,878 | 191,399 | 204,797 | 219,133 | 234,473 |
| Travel & Entertainment | 274,997 | 310,425 | 325,946 | 348,762 | 373,176 | 399,298 | 427,249 |
| **Total Sales & Marketing Expenses** | 2,041,632 | 1,715,320 | 2,123,333 | 2,804,810 | 3,573,503 | 4,538,064 | 5,552,830 |
| *% Increase in Warehouse Expense* | | | | 7% | 7% | 7% | 7% |
| | | | | | | | |
| **General & Administrative Expenses** | | | | | | | |
| Accounting | 6,988 | 170,041 | 187,045 | 224,454 | 269,345 | 350,148 | 490,208 |
| Bad Debt | 1,087 | 70,890 | 77,979 | 93,575 | 112,290 | 145,977 | 204,368 |
| Auto & Truck | 34,659 | 16,548 | 18,203 | 21,843 | 26,212 | 34,076 | 47,706 |
| Consulting | 287,815 | 17,300 | 19,030 | 22,836 | 27,403 | 35,624 | 49,874 |
| Insurance | 484,508 | 631,322 | 694,454 | 833,345 | 1,000,014 | 1,300,018 | 1,820,026 |
| Legal | 136,630 | 236,269 | 259,896 | 311,875 | 374,250 | 486,525 | 681,135 |
| Marketing | 190 | - | - | - | - | - | - |
| New Product Development | 4,457 | 53,398 | 58,738 | 70,485 | 84,582 | 109,957 | 153,940 |
| Office | 204,424 | 327,844 | 360,628 | 432,754 | 519,305 | 675,096 | 945,135 |
| Rent | 162,280 | 90,018 | 99,020 | 118,824 | 142,589 | 185,365 | 259,511 |
| Salaries - Executive | 245,238 | 165,308 | 408,000 | 489,600 | 587,520 | 763,776 | 1,069,286 |
| Salaries - Finance | 102,212 | 136,083 | 149,691 | 179,630 | 215,555 | 280,222 | 392,311 |
| Salaries - Operations | 151,364 | 379,027 | 416,930 | 500,316 | 600,379 | 780,492 | 1,092,689 |
| Payroll Taxes | 80,507 | 117,600 | 129,360 | 155,232 | 186,278 | 242,162 | 339,027 |
| Telephone | | 57,278 | 63,006 | 75,607 | 90,728 | 117,947 | 165,126 |
| Utilities | 56,081 | 11,984 | 13,182 | 15,819 | 18,983 | 24,677 | 34,548 |
| Web Technology | 4,764 | 5,116 | 5,628 | 6,753 | 8,104 | 10,535 | 14,749 |
| **Total General & Administrative Expenses** | 1,963,204 | 2,486,026 | 2,960,790 | 3,552,948 | 4,263,538 | 5,542,599 | 7,759,638 |
| *% Increase in Warehouse Expense* | | | | 20% | 20% | 30% | 40% |
| | | | | | | | |
| **Payment of Debt** | | | | | | | |
| DeLaski Debt - 7.5% | | 5,000,000 | - | - | - | - | - |
| Amount Repaid | | (5,000,000) | - | - | - | - | - |
| Balance of DeLaski Debt | | - | - | - | - | - | - |
| | | | | | | | |
| Kevin Park Debt - 12 % | | 1,531,493 | - | - | - | - | - |
| Additional Debt | | (1,531,493) | - | - | - | - | - |
| Amount Repaid | | - | - | - | - | - | - |
| Balance of Kevin Park Debt | | | | | | | |
| | | | | | | | |
| Wells Fargo Note - 5% | | 9,185 | - | - | - | - | - |
| Amount Repaid | | (9,185) | - | - | - | - | - |
| Balance of Wells Fargo Note | | - | - | - | - | - | - |
| | | | | | | | |
| PnC Equipment Note - 5% | | - | 13,001 | 5,129 | - | - | - |
| Amount Repaid | | 13,001 | (7,872) | (5,129) | - | - | - |
| Balance of PNC Equipment Note | | 13,001 | 5,129 | - | - | - | - |
| | | | | | | | |
| Line of Credit - 6% | | | | | | | |
| Prior Balance | | - | 1,300,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Line of Credit Draws | | 2,600,000 | 1,700,000 | | | | |
| Line of Credit Repayments | | (1,300,000) | | | | | |
| Line of Credit Balance | | 1,300,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| | | | | | | | |
| Interest Expense | | | | | | | |
| Delaski Debt | | 187,500 | - | - | - | - | - |
| Kevin Park Debt | | 101,260 | - | - | - | - | - |
| Line of Credit | | 31,000 | 133,500 | 180,000 | 180,000 | 180,000 | 180,000 |
| Wells Fargo Note | | 276 | - | - | - | - | - |
| PNC Equipment Note | | 510 | 437 | - | - | - | - |
| **Total Interest** | | 320,546 | 133,937 | 180,000 | 180,000 | 180,000 | 180,000 |

**Exhibit 3**



## Richard Boyer, CPA
**Managing Member**

Orange County
1001 Damascus Circle
Costa Mesa, CA 92626

Tel: 714-325-4000
Fax: 714-556-7222

richgboyer@cs.com

### CONSULTANCY AREAS

- Accounting systems and cost accounting
- Aviation
- Bankruptcy and restructuring
- Business startups including organizational and entity planning
- Deferred giving
- Domestic and international tax planning and compliance
- Gas & Oil Accounting
- Income and estate planning
- International business
  - o Europe
  - o Asia
  - o Africa
- Nonprofit creation, compliance, and best practices both domestically and internationally
- Strategic conceptual planning
- Troubled Asset restructuring

### OVERVIEW

Richard Boyer is the Managing Member of the Gensley Group Limited LLC. The Gensley Group Limited LLC is a California Limited Liability Company that has been performing consultancy services since 1997.

### AREAS OF CONSULTANCY

Mr. Boyer specializes in management advisory services, accounting and cost accounting services, banking, financial and estate planning, tax compliance, tax planning and tax representation services for profit and non-profit organizations both domestically and internationally. His expertise also includes real estate development, entertainment accounting and strategies, gas and oil accounting, foreign tax planning and compliance, securities compliance, accounting and compliance for non-profit organizations, and general business organization and development.

Mr. Boyer is proficient in strategic planning for various business develop including business plan preparation, financial forecasting and preparation of private placement memorandums and risk disclosures.

### EDUCATION

Mr. Boyer is a 1971 Magna Cum Laude graduate of California State University at Long Beach, California. Mr. Boyer obtained his certificate entitling him to practice as a Certified Public Accountant in 1972 from the California State Board of Accountancy.

### PROFESSIONAL BACKGROUND

Following his tenure with the national accounting firm of Haskins and Sells (now Deloitte Touche), he opened his accounting practice in 1974. In 1978, he merged his accounting practice with Balser, Horowitz, Frank & Wakeling, an accounting corporation located in Orange County, California. Balser, Horowitz, Frank & Wakeling was formed in 1937 and has continually enjoyed a reputation for providing high quality, full service accounting both domestically and internationally. Mr. Boyer retired from Balser, Horowitz, Frank & Wakeling effective January 1, 1998.

Mr. Boyer is a member of the California Society of Certified Public Accountants. In 1986 Mr. Boyer successfully completed the curriculum requirement for a certificate in Advanced Personal Financial Planning as issued by the California Certified Public Accountants' Foundation for Education and Research. In 1996 Mr. Boyer successfully completed all course requirements of the National oil and Gas Accounting School as conducted by The Council of Petroleum Accountants Societies and Professional Development Institute of the University of North Texas

**ELEEMOSYNARY PURSUITS**

Mr. Boyer is a director in various civic and humanitarian non-profit organizations.

He has been a financial advisor and auditor for Youth With A Mission - Mercy Ships International since 1981. This organization provides relief and development services utilizing hospital ships to deliver relief and medical services throughout the world.

Mr. Boyer is also a financial and program advisor to Hope Force International, a relief and development organization that provides disaster relief throughout the world. This organization has partnered with the Salvation Army to provide domestic training for disaster readiness.

Mr. Boyer is also a director for Alpenland Ministries since 1978. This non-profit organization provides relief and development services in Eastern Europe.

Additionally, Mr. Boyer has been a director for the Orange County Rescue Mission since 1976 and was this organization's Chairman of the Board for ten years. This organization provides temporary housing, food and clothing for the homeless in Orange County, California.

Mr. Boyer is also a director of Elias Malki Middle East Gospel Outreach, a Christian evangelical organization.

**RICHARD BOYER**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90017.

A true and correct copy of the foregoing document entitled (*specify*) EMERGENCY MOTION FOR INTERIM ORDER (A) AUTHORIZING POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (B) GRANTING LIENS, INCLUDING PRIMING LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDER PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, AND (C) PROVIDING ADEQUATE PROTECTION TO PREPETITION LENDERS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF JAMES LACEY, RICHARD G. BOYER, AND WILLIAM R. VOSS IN SUPPORT THEREOF will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On September 9, 2014, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On  September 9, 2014 I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on  September 9, 2014, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT MAIL**
The Hon. Peter H. Carroll
United States Bankruptcy Court
1415 State Street, Suite 230
Santa Barbara, CA 93101-2511

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 9, 2014 | Jason Klassi | /s/ Jason Klassi |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**9:14-bk-11776-PC Notice will be electronically mailed to:**

Janet L Chubb on behalf of Creditor Sierra Packaging & Converting
lbubala@kcnvlaw.com, wapplegate@kcnvlaw.com

Robert E Dye on behalf of Interested Party Courtesy NEF
rdye@ckdcounsel.com, sransom@ckdcounsel.com

Robert E Dye on behalf of Partner Charles, Kane & Dye, LLP
rdye@ckdcounsel.com, sransom@ckdcounsel.com

Richard W Esterkin on behalf of Creditor Provident Trust Group, LLC
resterkin@morganlewis.com, vrader@morganlewis.com

Richard W Esterkin on behalf of Creditor The Chung Family Trust
resterkin@morganlewis.com, vrader@morganlewis.com

Brian D Fittipaldi on behalf of U.S. Trustee United States Trustee (ND)
brian.fittipaldi@usdoj.gov

John-Patrick M Fritz on behalf of Debtor Crunchies Food Company, LLC
jpf@lnbrb.com

Mette H Kurth on behalf of Interested Party Courtesy NEF
kurth.mette@arentfox.com, nancy.peters@arentfox.com

David L. Neale on behalf of Debtor Crunchies Food Company, LLC
dln@lnbrb.com

Sean A Okeefe on behalf of Creditor DeLaski Revocable Trust
sokeefe@okeefelc.com

Evan D Smiley on behalf of Creditor Chaucer Foods
esmiley@wgllp.com, msciesinski@wgllp.com

United States Trustee (ND)
ustpregion16.nd.ecf@usdoj.gov

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9013-3.1.PROOF.SERVICE**